UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DAYVID JIMINEZ,

                            Plaintiff,

                                                            5:22-cv-984
v.                                                          (MAD/TWD)

CITY OF COHOES POLICE DEPT., et al.,

                            Defendants.
_____

APPEARANCES:

DAYVID JIMINEZ
055-769-136
Plaintiff, *pro se*
Buffalo Federal Detention Facility
4250 Federal Drive
Batavia, NY 14020

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>ORDER AND REPORT-RECOMMENDATION</u>

Dayvid Jiminez ("Plaintiff") initiated this action *pro se* on or about September 19, 2022,

asserting claims under 42 U.S.C. § 1983 against the City of Cohoes Police Department, Officer J.

Murphy in his official capacity, Officer John Doe 1 in his official capacity, and Officer John Doe

2 in his official capacity (collectively, "Defendants").  (*See* Dkt. No. 1 at 2-3.)  On September

20, 2022, Judge Mae A. D'Agostino denied Plaintiff's *in forma pauperis* ("IFP") application as

incomplete, ordered the administrative closure of the matter, and permitted Plaintiff to reopen the

matter by timely filing a complete IFP application and inmate authorization form.  (Dkt. No. 5.)

Plaintiff subsequently requested leave to amend the Complaint, which the undersigned denied

without prejudice due to the case being administratively closed.  (*See* Dkt. Nos. 6-7.)  The case

was reopened on October 4, 2022, when Plaintiff filed a complete IFP application and inmate authorization form. (*See* Dkt. Nos. 9-11.)

The Clerk sent Plaintiff's IFP application and Complaint to the undersigned for initial review. Plaintiff's IFP application is hereby GRANTED for purposes of this review. (Dkt. No. 9.) The undersigned now considers the sufficiency of the allegations set forth in the Complaint under 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A.

## I.     SUMMARY OF THE COMPLAINT[1]

On May 3, 2022, Plaintiff "was pulled over and was given a ticket for" failing to signal, and because he was racially profiled. (Dkt. No. 1 at 5-6.) During the stop, Officer Murphy handcuffed and arrested Plaintiff "for a[n] immigration civil warrant." *See id.* at 5; *see also id.* at 6 ("Officers from the City of Cohoes Police Department, effectuated an arrest pursuant to ICE administrative warrants."). Officer Murphy subsequently brought Plaintiff to the precinct, and "John Doe searched and seiz[ed] [his] vehicle." *See id.* at 5. Plaintiff is "now in ICE custody as a result of a police officer calling the Department of Homeland Security." *See id.* at 6.

Plaintiff claims these events violated his Fourth and Fourteenth Amendment rights. *See id.* at 3. He avers these violations caused him "pain and suffering, emotional distress, los[s] of freedom, los[s] of time with [his] children, and an increase in depression and anxiety about returning to a country he is "afraid to go back to." *See id.* at 4.

---

[1] The following recitation of facts is drawn from the Complaint, which the Court accepts as true for purposes of initial review. *See, e.g., LaTouche v. Rockland County*, No. 22-CV-1437 (LTS), 2022 WL 953111, at *1 (S.D.N.Y. Mar. 29, 2022); *Walker v. City of New York*, No. 20-CV-5240 (PKC) (LB), 2021 WL 1838277, at *1 n.1 (E.D.N.Y. May 7, 2021).

## II.    STANDARD OF REVIEW

This Court must conduct an initial review of complaints filed *in forma pauperis*, and "complaints in which a prisoner[2] seeks redress from a governmental entity or officer or employee of a governmental entity."  28 U.S.C. § 1915(e)(2)(B) (governing complaints filed *in forma pauperis*); 28 U.S.C. § 1915A (governing complaints filed by prisoners against the government). When reviewing these types of complaints, this Court must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted; or . . . seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A; 28 U.S.C. § 1915(e)(2)(B); *see also Allen v. Stringer*, No. 20-3953, 2021 WL 4472667, at *1 (2d Cir. Sept. 30, 2021) (applying Section 1915(e)(2)(B)); *Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (applying Section 1915A).[3]

This Court must exercise caution when determining whether to *sua sponte* dismiss a *pro se* complaint on the grounds that it is frivolous.  *See Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991); *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).  "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory."  *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998).  "A claim is

---

[2] Plaintiff is a "prisoner" as that term is used in 28 U.S.C. § 1915A(a).  (*See* Dkt. No. 9 at 1; *see also* 28 U.S.C. § 1915A(c) (defining "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program.").)

[3] Unless otherwise indicated, in quoting cases, all alterations, internal quotation marks, emphases, footnotes, and citations are omitted.  *See, e.g.*, *Sczepanski v. Saul*, 946 F.3d 152, 157 n.4 (2d Cir. 2020).

based on an indisputably meritless legal theory when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint." *Id.*

When undertaking this initial review, the Court must construe *pro se* pleadings with the utmost leniency. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (holding that a *pro se* litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers"); *see also Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). To survive dismissal for failure to state a claim, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This short and plain statement of the claim must be "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The statement of the claim must do more than present "an unadorned, the-defendant-harmed-me accusation." *Iqbal*, 556 U.S. at 678. It must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. 544, 555; *see also* Fed. R. Civ. P. 8(a)(2).

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

### III.    SUFFICIENCY OF THE COMPLAINT

The undersigned recommends that the Court dismiss Plaintiff's Complaint with leave to

amend because it is frivolous, it fails to state a claim, and the individual Defendants are not liable

for Section 1983 suits advanced against them in their official capacities.  *See* 28 U.S.C.

§ 1915(e)(2)(B); 28 U.S.C. § 1915A(b).

First, Plaintiff's Fourth Amendment claim is frivolous because a dispositive defense

exists on the face of the Complaint.  *See Livingston*, 141 F.3d at 437.  The constitutional

reasonableness of a traffic stop does not depend on the actual motivations of the individual

officers involved—"the Fourth Amendment's concern with reasonableness allows certain actions

to be taken in certain circumstances, *whatever* the subjective intent."  *See Wren v. United

States*, 517 U.S. 806, 813-14 (1996) (emphasis in original).  "As a general matter, the decision to

stop an automobile is reasonable where the police have probable cause to believe that a traffic

violation has occurred."  *Id.* at 810.  There is "probable cause to stop and arrest" an individual,

like Plaintiff, when an officer "directly observe[s] him violating the traffic laws by not signaling

lane changes."  *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994); *see generally* N.Y. Veh.

& Traf. Law § 1163(a) (requiring motorists to use a signal before turning or changing lanes).

Here, Plaintiff concedes Officer Murphy pulled him over for failing to signal.  (*See* Dkt. No. 1 at

6.)  Plaintiff's Fourth Amendment claim against Officer Murphy is accordingly frivolous

because a dispositive defense (i.e., there was probable cause for the traffic stop) appears on the

face of the Complaint.  *See, e.g.*, *Aikman v. Cnty. of Westchester*, 491 F. Supp. 2d 374, 381

(S.D.N.Y. 2007) (dismissing the claimant's Fourth Amendment racial profile claim where the

officers "had probable cause to believe [he] violated New York traffic laws"); *Viator v. City of

Rochester*, No. 02-CV-6453, 2005 WL 1876064, at *5 (W.D.N.Y. Aug. 8, 2005) (dismissing the

claimant's Fourth Amendment racial profile claim because the officer observed him fail to signal in violation of New York State Vehicle and Traffic Law § 1163(a)). The undersigned accordingly recommends that the Court dismiss Plaintiff's Fourth Amendment traffic stop claim on the grounds that it is frivolous. *See* 28 U.S.C. § 1915(e)(2)(B)(i); 28 U.S.C. § 1915A(b)(1).

Second, Plaintiff failed to plead sufficient factual content to allow this Court to draw the reasonable inference that Defendants are liable for Fourth and Fourteenth Amendment violations. *See Iqbal*, 556 U.S. at 678. For purposes of Plaintiff's post-traffic-stop Fourth Amendment claims, he has failed to set forth a short and plain statement stating who did what to him, when they did it, and how he was injured. *See id.*; *see also* Fed. R. Civ. P. 8(a)(2). Absent these basic details, Plaintiff's Complaint has failed to give Defendants fair notice of what his post-traffic-stop Fourth Amendment claims are and the grounds upon which they rest. *See Twombly*, 550 U.S. at 555; *see also* Fed. R. Civ. P. 8(a)(2). Accepting the facts alleged in Plaintiff's entire Complaint as true and construing all reasonable inferences in his favor, *Hernandez*, 18 F.3d at 136, the Court is left with "an unadorned, the-defendant-harmed-me accusation." *See Iqbal*, 556 U.S. at 678. The undersigned accordingly recommends that the Court dismiss Plaintiff's post-traffic-stop Fourth Amendment claims for failure to state a claim. *See id.*; *see also* 28 U.S.C. § 1915(e)(2)(B)(ii); 28 U.S.C. § 1915A(b)(1).

Plaintiff's Fourteenth Amendment claim—asserted against the City of Cohoes Police Department and each officer in their official capacities—appears to advance a municipal liability claim. (*See* Dkt. No. 1; *see generally Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 n.55 (1978) (explaining "official-capacity suits generally represent . . . another way of pleading an action against an entity of which an officer is an agent").) "To hold a municipality liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is

6

required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020). Accordingly, "[a] municipality cannot be made liable under § 1983 by application of the doctrine of *respondeat superior*, but rather the plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury." *Id.* Here, Plaintiff has failed to adequately plead any of the three elements required to prove municipal liability under 42 U.S.C. § 1983. *Compare id. with* Dkt. No. 1. Plaintiff failed to allege the City of Cohoes Police Department racially profiled pursuant to an official policy or custom. (*See* Dkt. No. 1.) Nor does he allege such a policy caused a deprivation of his Fourteenth Amendment rights. *See id.* The undersigned accordingly recommends that the Court dismiss Plaintiff's Fourteenth Amendment claims for failure to state a claim. *See* 28 U.S.C. § 1915(e)(2)(B)(ii); 28 U.S.C. § 1915A(b)(1).

Finally, the individual Defendants are not liable for suits advanced against them under 42 U.S.C. § 1983 in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) ("There is no longer a need to bring official-capacity actions against local government officials, for under *Monell, supra,* local government units can be sued directly for damages and injunctive or declaratory relief."). Plaintiff's Section 1983 claims against the individual Defendants acting in their official capacities are effectively claims against the City of Cohoes. *See id.* at 165-67; *see also Monell*, 436 U.S. at 691 n.55. The official capacity claims against the individual defendants should accordingly be dismissed as redundant. *See, e.g.*, *New York Youth Club v. Town of Harrison*, 150 F. Supp. 3d 264, 275 (S.D.N.Y. 2015) (dismissing as redundant claims asserted against individual defendants in their official capacities); *Riley v. Town of Bethlehem*, 44 F. Supp. 2d 451, 467 (N.D.N.Y. 1999) (same). The undersigned accordingly

recommends that the Court dismiss the official capacity claims against the individual defendants as redundant and therefore frivolous.  *See* 28 U.S.C. § 1915(e)(2)(B)(ii); 28 U.S.C. § 1915A(b)(1).

## IV.    CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court dismiss Plaintiff's Complaint with leave to amend.  (Dkt. No. 1.)

**ACCORDINGLY**, it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 9) is **GRANTED** solely for purposes of initial review; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 1) be **DISMISSED WITH LEAVE TO AMEND** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[4]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

---

[4] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1)

(Supp. 2013); Fed. R. Civ. P. 72, 6(a).


Dated: November 7, 2022
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2022 WL 953111
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Valery LATOUCHE, Plaintiff,

v.

ROCKLAND COUNTY; Rockland County Jail;
John Morley, Chief Medical Officer; Department
of Correctional Services; Dr. Jacobson, DDS,
Sing Sing Correctional Facility; Tushar Udeshi,
DDS, Sing Sing Correctional Facility, Defendants.

22-CV-1437 (LTS)
|
Signed 03/29/2022

**Attorneys and Law Firms**

Valery LaTouche, Ossining, NY, Pro Se.

ORDER TO AMEND

LAURA TAYLOR SWAIN, Chief United States District
Judge:

 **\*1**  Plaintiff, who is currently incarcerated at Sing Sing
Correctional Facility (Sing Sing), brings this *pro se* action
under 42 U.S.C. § 1983, asserting numerous claims that
are wholly unrelated to one another. Plaintiff brings claims
arising from his 2004 arrest, and he challenges his 2005
conviction. Plaintiff also brings claims about his medical
care, which he asserts against: (1) two dentists who allegedly
provided "negligent" dental care in 2016, at Sing Sing; and (2)
the Rockland County Jail, the New York State Department of
Corrections and Community Supervisions (DOCCS),[1] and
DOCCS Chief Medical Officer John Morley in connection
with medical treatment of Plaintiff's hair loss, eczema, and
gynecomastia.

[1]   Plaintiff names as a defendant "Department
of Correctional Services," which the Court
understands to refer to the DOCCS, rather than the
New York City Department of Correction.

By order dated March 14, 2022, the Court granted Plaintiff's
request to proceed *in forma pauperis* (IFP), that is, without
prepayment of fees.[2]

[2]   Prisoners are not exempt from paying the full filing
fee even when they have been granted permission
to proceed *in forma pauperis*. *See* 28 U.S.C. §
1915(b)(1).

STANDARD OF REVIEW

The Prison Litigation Reform Act requires that federal courts
screen complaints brought by prisoners who seek relief
against a governmental entity or an officer or employee of a
governmental entity. *See* 28 U.S.C. § 1915A(a). The Court
must dismiss a prisoner's *in forma pauperis* complaint, or any
portion of the complaint, that is frivolous or malicious, fails
to state a claim upon which relief may be granted, or seeks
monetary relief from a defendant who is immune from such
relief. 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b); *see Abbas v.
Dixon*, 480 F.3d 636, 639 (2d Cir. 2007). The Court must
also dismiss a complaint if the court lacks subject matter
jurisdiction. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the
court is obliged to construe *pro se* pleadings liberally, *Harris
v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them
to raise the "strongest [claims] that they *suggest*," *Triestman
v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)
(internal quotation marks and citations omitted) (emphasis in
original). But the "special solicitude" in *pro se* cases, *id.* at
475 (citation omitted), has its limits – to state a claim, *pro se*
pleadings still must comply with Rule 8 of the Federal Rules
of Civil Procedure, which requires a complaint to make a short
and plain statement showing that the pleader is entitled to
relief.

BACKGROUND

Plaintiff Valery LaTouche alleges the following facts, which
the Courts accepts as true for purposes of screening the
complaint.

**1. False Arrest**

In 2004, Plaintiff was at a friend's house in New City,
Rockland County, New York. (ECF 1 at 2.) There was a
"police raid," and Plaintiff was "unreasonably seized by a
Ramapo police officer." (*Id.*) He was arrested and charged
with unlawful possession of weapons. Later, at a preliminary

hearing, the charges against Plaintiff were dismissed based on information that he did not reside in the home.

 **\*2** In 2005, Plaintiff was arrested on an "active warrant" arising from the 2004 police raid, which "was used as cause" to detain him in connection with the charges for which he is currently serving a sentence. [3] Plaintiff obtained, in 2021, a certificate of dismissal from the Ramapo Town Court in connection with the weapons possession charges. Plaintiff sues the County of Rockland for false imprisonment and violations of his rights under the Fourth Amendment in connection with this 2004 arrest, for which the charges were dismissed.

[3]       In the report and recommendation addressing Plaintiff's petition for a writ of *habeas corpus* under 28 U.S.C. § 2254, the court noted that Plaintiff was arrested because a plainclothes officer believed that there was an outstanding warrant from Clarkstown for his arrest, but he was released when it was determined that the warrant was no longer valid. *See LaTouche v. Graham*, No. 7:10-CV-01388, 44 (PED) (S.D.N.Y. Mar. 8, 2013) (R & R at 3-4), *adopted* (ECF 55) (S.D.N.Y. Sept. 24, 2013).

### 2. Challenge to 2005 Conviction

Plaintiff asserts claims against Defendant "Rockland County Supreme Court," in connection with Justice Kevin Russo's handling of Plaintiff's post-conviction motions, under New York Criminal Procedure Law § 440.10.

Plaintiff contends that the Rockland County District Attorney, in opposing Plaintiff's December 18, 2018 motion to vacate his conviction, ignored the arguments that Plaintiff was actually innocent and disputed that defense counsel was ineffective in failing to present evidence of Plaintiff's "low intellectual disability." (*Id.* at 4, ¶ 19.) Justice Russo denied Plaintiff's motion under New York Criminal Procedure Law § 440.10(3)(c) based on Plaintiff's failure to have raised these arguments in his earlier § 440.10 motions. (*Id.* at 4, ¶ 20.) Justice Russo also denied the motion for rehearing, and the Appellate Division, Second Department, denied leave to appeal.

Plaintiff also filed applications in state court arguing (1) that his § 440.10 motion should not have been heard by Justice Russo, whose law clerk was a former prosecutor who had previously worked for a judge who is biased against Plaintiff (Justice Kelly); and (2) that the Grand Jury proceedings were

flawed. Plaintiff seeks only damages in this complaint and has not requested any other relief in connection with these claims against the Rockland County Supreme Court.

### 3. Medical Treatment

During Plaintiff's confinement as a pretrial detainee at Rockland County Jail in 2005, he was diagnosed with depression and placed on suicide watch. Plaintiff was prescribed two antidepressant medications: Rameron and Atrax. (*Id.* at 6, ¶ 25.) In May 2005, a doctor at the jail diagnosed Plaintiff with gynecomastia "as a result of his [in]gestion of Rameron." (*Id.* at ¶ 26.) Plaintiff was referred "to a surgeon for a biopsy." (*Id.* at ¶ 27.) Before the biopsy took place, Plaintiff was convicted and taken into DOCCS custody. (*Id.*)

DOCCS initially housed Plaintiff at Downstate Correctional Facility, where he "repeatedly sought medical attention for his gynecomastia." (*Id.*) On an unspecified date, after Plaintiff was transferred to Sing Sing, he asked Doctors Kwan, Bigaud, and Ezeke for medical treatment because he had pain when lying on his chest. Plaintiff had a mammogram, which had a "negative result." (*Id.* at 6.) Plaintiff continued to complain about the gynecomastia, and gave Sing Sing physician Dr. Muthra, who is not named as a defendant in this action, documents from Rockland County Jail that showed his earlier referral for a biopsy. Dr. Muthra explained that the "Albany official" denied Plaintiff's request for a biopsy based on the results of the mammogram and because treatment for the breast enlargement itself is considered a "cosmetic procedure." (*Id.* at 6, ¶ 29.) Plaintiff brings claims against Rockland County Jail, DOCCS, and its Chief Medical Officer John Morley for failing to treat his gynecomastia.

 **\*3** On August 30, 2021, Dr. Muthra told Plaintiff that there was "a spike in his hormonal glands," which can indicate a "possible benign tumor." (*Id.*) Plaintiff was sent to an outside hospital for an MRI. (*Id.* at 7.) At Plaintiff's next medical visit, when he inquired about the MRI results, Dr. Muthra told Plaintiff that his earlier abnormal "blood test w[as] likely a lab error," but that he would continue to monitor Plaintiff's status. (*Id.*)

On an unspecified date, Plaintiff told "his medical provider" at Sing Sing that he had a recurring skin rash, and it was diagnosed as eczema. (*Id.* at 7, ¶ 32.) Plaintiff continued to complain about itching, apparent "ringworm," and hair thinning and bald spots on his scalp and beard. Dr. Muthra prescribed a topical cream (fluocinolone acetonide) for

Plaintiff, and he was given "tar shampoo" and lotion with vitamin E. Plaintiff asked for a biopsy and dermatologist visit, but these requests were denied, and Plaintiff was told that "the Albany official considers his condition to be cosmetic." (*Id.* at ¶ 33.) Plaintiff asserts claims against DOCCS and its Chief Medical Officer, John Morley, for denying him "over the counter drug[s] minoxidil, corticosteroid, [and] antholin for his scalp." (*Id.* at 31.)

### 4. Dental Care at Sing Sing in 2016

On April 4, 2016, at Sing Sing, Dr. Allen Jacobson examined Plaintiff's teeth and found cavities and decay. (*Id.* at 2-3.) Two weeks later, on April 19, 2016, dental hygienist cleaned Plaintiff's teeth. Dr. Jacobson then filled the cavity in Plaintiff's tooth #12 but warned him that the cavity was deep, and the tooth might need to be extracted. (*Id.* at 3.) Shortly after the filing, "the tooth became infected," and Plaintiff suffered "extreme sensitivity" and shooting pain. On July 18, 2016, Dr. Jacobson attempted to "file down" the injured tooth. X-rays were taken and these showed that "cavities surrounding the tooth" caused scraping near the nerve. Dr. Jacobson advised Plaintiff that the tooth needed to be extracted, but Plaintiff refused and asked him to "cur[e] the infection." (*Id.*) Dr. Jacobson prescribed penicillin and ibuprofen.

On July 22, 2016, another dentist at Sing Sing, Dr. Udeshi, told Plaintiff that tooth #12 needed to be extracted. Plaintiff told Dr. Udeshi that the medication that Plaintiff had taken was provided to "save the tooth," and he refused the extraction. (*Id.* at 3.)

In 2021, the filling in tooth #12 fell out. Dr. K. Rakib examined Plaintiff and found deep cavities in the "tooth opposite ... tooth #12." (*Id.* at 3-4.) Plaintiff told Dr. Rakib that he had been unable to chew on his left side, where tooth #12 was located, due to the "destructive dental filling." (*Id.* at 4.) As a result, he chewed on the other side of his mouth, which "cause[d] the decay in the tooth opposite #12." (*Id.*) On January 21, 2022, Plaintiff's tooth #12 was extracted. Plaintiff asserts claims against Doctors Jacobson and Udeshi for "negligen[ce]" and failing to provide "adequate dental treatment." (*Id.* at 2.)

Plaintiff brings this complaint against Defendants Rockland County, Rockland County Jail, Dentists Jacobson and Udeshi, DOCCS and DOCCS Chief Medical Officer John Morley. Plaintiff seeks $35 million in damages.

## DISCUSSION

### A. Timeliness

Many of Plaintiff's claims under section 1983 appear to be time-barred. The statute of limitations for section 1983 claims is found in the "general or residual [state] statute [of limitations] for personal injury actions." *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (quoting *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)). In New York, that period is three years. *See* N.Y. C.P.L.R. § 214(5). Section 1983 claims generally accrue when a plaintiff knows or has reason to know of the injury that is the basis of the claim. *Hogan v. Fischer*, 738 F.3d 509, 518 (2d Cir. 2013). Plaintiff knew of his injuries when they occurred, and his claims therefore accrued at that time. Plaintiff's claims arising more than three years before he filed this complaint on February 22, 2022 therefore are time-barred, including his claims arising from his 2004 arrest, his 2005 conviction, his medication with Rameron at Rockland County Jail in 2005, and his dental treatment in 2016.

**\*4** Because the failure to file an action within the limitations period is an affirmative defense, a plaintiff is generally not required to plead that the case is timely filed. *See Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007). Dismissal is appropriate, however, where the existence of an affirmative defense, such as the statute of limitations, is plain from the face of the pleading. *See Walters v. Indus. and Commercial Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011) ("[D]istrict courts may dismiss an action *sua sponte* on limitations grounds in certain circumstances where the facts supporting the statute of limitations defense are set forth in the papers plaintiff himself submitted.") (internal quotation marks and citation omitted); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) (affirming *sua sponte* dismissal of complaint as frivolous on statute of limitations grounds); *see also Abbas*, 480 F.3d at 640 (concluding that district court should grant notice and opportunity to be heard before dismissing complaint *sua sponte* on statute of limitations grounds).

If Plaintiff amends his complaint, and the amended complaint includes any claim arising more than three years before he filed the original complaint on February 22, 2022, he must include any facts showing why the claim should not be deemed time-barred. The doctrine of equitable tolling permits a court, "under compelling circumstances, [to] make narrow exceptions to the statute of limitations in order 'to prevent inequity.' " *In re U.S. Lines, Inc.*, 318 F.3d 432, 436 (2d Cir.

2003) (citation omitted). The statute of limitations may be equitably tolled, for example, when a defendant fraudulently conceals from a plaintiff the fact that the plaintiff has a cause of action, or when the plaintiff is induced by the defendant to forego a lawsuit until the statute of limitations has expired. *See Pearl*, 296 F.3d at 82-83. [4]

[4]     In addition, New York provides by statute for other circumstances in which a limitations period may be tolled. *See, e.g.*, N.Y. C.P.L.R. § 204(a) (where commencement of an action has been stayed by court order), *id.* at § 204 (where a dispute has been submitted to arbitration but is determined to be non-arbitrable), id. at § 207(3) (defendant is outside New York at the time the claim accrues), *id.* at § 208 (plaintiff is disabled by infancy or insanity).

As set forth below, even if Plaintiff's claims were not time-barred, the allegations of the complaint generally fail to state a federal claim on which relief can be granted or are otherwise not cognizable in an action under section 1983.

## B. False Arrest in 2004

The Court first looks to state law to establish the elements of a false arrest claim under section 1983. *See Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 925 (2017) ("[T]o flesh out the elements of this constitutional tort, we must look for 'tort analogies.' "); *see also Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018) (holding that common law principles are meant simply to guide rather than to control the definition of Section 1983 claims and courts should not "mechanically apply" the law of New York State).

Under New York law, to state a claim for false arrest, a plaintiff must show that: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Liranzo v. United States*, 690 F.3d 78, 95 (2d Cir. 2012). An arrest is privileged if it is based on probable cause. *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007).

Officers have probable cause to arrest when they "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (emphasis and citation omitted). "Probable cause can exist even where

it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Bernard v. United States*, 25 F.3d 98, 102 (1994); *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (holding that a police officer is "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.").

**\*5** Here, Plaintiff alleges that he was arrested after a "raid" on a home where unlawful weapons were found, and that the charges against him were dismissed when he demonstrated that he did not reside in the home. The fact that the charges against Plaintiff were dismissed, without more, is insufficient to plead plausibly that the Ramapo police officer who arrested Plaintiff lacked probable cause to do so.

Moreover, Plaintiff has not sued an individual officer who allegedly made a wrongful arrest. Instead, he brings this claim against the County of Rockland. To state a claim against a municipality, such as the County of Rockland, a plaintiff must allege that the municipality itself violated Plaintiff's rights. *See Connick v. Thompson,* 131 S. Ct. 1350, 1359 (2011). It is not enough for the plaintiff to allege that one of the municipality's employees or agents engaged in some wrongdoing. To state a § 1983 claim against a municipality, the plaintiff must allege facts showing (1) the existence of a municipal policy, custom, or practice, and (2) that the policy, custom, or practice caused the violation of the plaintiff's constitutional rights. *See Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) (internal citations omitted).

Even if Plaintiff had adequately alleged that a police officer violated his rights, which he has not done, that allegation would be insufficient to provide a basis for liability on the part of the County of Rockland. Plaintiff does not include any allegations that any policy, custom, or practice on the part of Rockland County violated his rights in connection with this 2004 arrest. Plaintiff thus fails to state a claim against the County of Rockland based on his 2004 arrest on charges that were later dismissed.

Plaintiff also suggests that this wrongful arrest in 2004 was used in 2005 as a pretense to arrest him for the charges for which he is currently serving a prison sentence. A prisoner cannot pursue civil rights claims that would necessarily be inconsistent with a conviction. *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). Moreover, even where a civil rights

claim would lie, a plaintiff cannot seek relief for "the 'injury' of being convicted and imprisoned (until his conviction has been overturned)." *Id.* at 477, n. 7. Plaintiff's 2005 conviction has not been overturned, and any claim for damages for the injury of serving this sentence would be inconsistent with this conviction.

As set forth above, these claims had been time-barred for nearly 15 years when Plaintiff filed this complaint. It therefore would be futile for Plaintiff to replead these claims, unless he has some adequate basis for equitable tolling.

**C. Challenge to 2005 Conviction**

Plaintiff brings civil rights claims regarding the denial of his post-conviction motions against Defendant "Rockland County Supreme Court." As an initial matter, "state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity...." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009). "The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Id.*

The Supreme Court of the State of New York, Rockland County, is a part of the New York State Unified Court System, and, as such, is an arm of the State of New York. *Id.* at 368 (explaining that a court that is part of the New York State Unified Court System "is unquestionably an 'arm of the State,' entitled to Eleventh Amendment sovereign immunity."). New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983. *See Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977). The Eleventh Amendment therefore bars Plaintiff's section 1983 claims against the Rockland County Supreme Court.

**\*6** Moreover, Plaintiff's allegations that Justice Russo wrongfully denied his § 440.10 motions are not cognizable in a civil rights action under section 1983. A prisoner can challenge the validity of his state conviction in federal court, or obtain release from custody, only by bringing a petition for a writ of *habeas corpus* under 28 U.S.C. § 2254. *See Wilkinson v. Dotson*, 544 U.S. 74, 78-82 (2005) (citing *Preiser v. Rodriguez*, 411 U.S. 475 (1973)) (noting that writ of *habeas corpus* is sole federal remedy for prisoner seeking to challenge the fact or duration of his confinement). Plaintiff's section 1983 claims challenging his conviction must therefore be dismissed for failure to state a claim on which relief can be granted and because defendant is immune from suit. 28 U.S.C. § 1915(e)(2)(b)(ii)-(iii).

The Court also declines to recharacterize these claims as arising under section 2254, because Plaintiff has already challenged his 2005 conviction in a petition for a writ of *habeas corpus* under 28 U.S.C. § 2254, which was denied on the merits. *See LaTouche v. Graham*, No. 7:10-CV-01388, 44 (PED) (S.D.N.Y. Mar. 8, 2013) (R & R at 3-4), *adopted* (ECF 55) (S.D.N.Y. Sept. 24, 2013), *certificate of appealability denied*, No. 13-3720 (2d Cir. Mar. 13, 2014), *lv to file successive petition denied*, No. 15-3662 (2d Cir. Dec. 7, 2015), *certificate of appealability denied*, No. 16-2885 (2d Cir. Feb. 13, 2017) (appeal of denial of Rule 60(b) motion), *lv to file successive petition denied*, No. 19-4006 (2d Cir. Jan 21, 2020). Plaintiff would require permission from the Court of Appeals to bring a new petition for a writ of *habeas corpus* under section 2254.

**D. Deliberate Indifference to Serious Medical Needs**

Plaintiff alleges that several defendants were deliberately indifferent to his serious medical needs. Such claims arise under the Due Process Clause of the Fourteenth Amendment, if Plaintiff was a pretrial detainee at the time of the events giving rise to his claims, and under the Eighth Amendment, if he was a convicted prisoner. *Bell v. Wolfish*, 441 U.S. 520, 536 n.16 (1979); *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). Whether Plaintiff was a pretrial detainee or convicted prisoner, he must satisfy two elements to state such a claim: (1) an "objective" element, which requires a showing that the challenged conditions are sufficiently serious, and (2) a "subjective" or "mental" element, which requires a showing that the officer acted with at least deliberate indifference to the challenged conditions. *Darnell*, 849 F.3d at 29.

The objective element of a deliberate indifference claim is the same for pretrial detainees and convicted prisoners. The plaintiff's medical need must be a "sufficiently serious" condition that "could result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)); *see also Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (noting that standard contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain").

The "subjective" or "mental" element varies depending on whether a plaintiff is a pretrial detainee or convicted prisoner. A convicted prisoner must allege that a correction official actually "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Darnell*, 849 F.3d at 32 (quoting *Farmer*, 511 U.S. at 837). That is, a convicted prisoner must allege that the official was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also [have] draw[n] the inference." *Id.* By contrast, a pretrial detainee need allege only that the official intentionally or recklessly failed to act with reasonable care "even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to health or safety." *Id.* at 35 (emphasis added).

\*7 The mere negligence of a correction official is not a viable basis for a claim of a federal constitutional violation under section 1983, under either the Eighth or the Fourteenth Amendment. *See Daniels v. Williams*, 474 U.S. 327, 335 (1986); *Davidson v. Cannon*, 474 U.S. 344, 348 (1986).

### 1. Dental Care

Plaintiff was a convicted prisoner as of 2016, when his claims for constitutional violations in connection with his dental care first arose. Plaintiff adequately alleges at this stage that his dental problems were a serious medical need. *See Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000) (holding that a tooth cavity is a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become painful or otherwise dangerous). Plaintiff therefore has pleaded facts showing that the objective prong of a deliberate indifference claim is satisfied.

Plaintiff fails, however, to plead any facts giving rise to an inference that either dentist acted with the subjective intent required for deliberate indifference. He states that Dr. Jacobson filled the cavity in Plaintiff's tooth #12 but warned him that the cavity was deep, and that the tooth might need to be extracted, which later proved true; Plaintiff nevertheless refused to have it extracted, and Dr. Jacobson prescribed penicillin and ibuprofen for the infection. These allegations do not show that Dr. Jacobson "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Darnell*, 849 F.3d at 32. On the contrary, it appears that Plaintiff acted against Dr. Jacobson's advice, and Dr. Jacobson then took steps to mitigate the danger to Plaintiff.

Plaintiff further alleges that, on July 22, 2016, Dr. Udeshi told Plaintiff that tooth #12 needed to be extracted, but Plaintiff refused the extraction. (ECF 2 at 3.) Plaintiff brings claims against Doctors Jacobson and Udeshi for "negligen[ce]" and failing to provide "adequate dental treatment." (*Id.* at 2.) These allegations are insufficient to support a claim of a constitutional violation, both because Plaintiff alleges that he was the one who refused the tooth extraction and because allegations of negligence are insufficient to state a claim that a defendant actually "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Darnell*, 849 F.3d at 32. Plaintiff's section 1983 claims against Doctors Jacobson and Udeshi must therefore be dismissed for failure to state a claim on which relief can be granted.

### 2. Cosmetic Conditions

Plaintiff alleges that Defendants have denied him adequate treatment for his hair loss and eczema because these are cosmetic conditions. "Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury to state a cognizable claim." *Washington v. Fludd*, No. 18-CV-1273(JS) (SIL), 2019 WL 1643542, at \*3 (E.D.N.Y. Apr. 16, 2019) (quoting *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (internal quotation marks and additional citation omitted; alteration in original)). A "cosmetic" condition can rise to the level of seriousness needed to establish a duty of care if: (1) a reasonable doctor would perceive the condition as important and worthy of treatment; (2) the condition significantly affects the prisoner's daily activities; and (3) the condition results in chronic and substantial pain. *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003).

\*8 Plaintiff alleges that he suffers from hair thinning and bald spots on his scalp and beard. Hair loss is generally not deemed a serious medical condition. *See, e.g., Guthrie v. US Fed. Bureau of Prisons*, No. 09-CV-990 (LAP), 2010 WL 2836155, at \*5 (S.D.N.Y. July 7, 2010) (holding that "[t]he BOP's duty of care to provide for the safekeeping of its prisoners does not require them to provide medication that is cosmetic in nature, including administering hair loss medication), *aff'd*, 421 F. App'x 120 (2d Cir. 2011). Plaintiff does indicate that he has "itching" on his scalp or beard, and apparent "ringworm," but these allegations do not show that he was in chronic or substantial pain at any relevant time or that the condition significantly affected his daily activities. He thus fails to plead facts showing that this was

a sufficiently serious medical condition that satisfies the objective component of a deliberate indifference claim.

Plaintiff also alleges that he was diagnosed with eczema. Skin conditions can be sufficiently serious to satisfy the objective component of a deliberate indifference claim. *Brock*, 315 F.3d at 163 (holding that prisoner's thick keloid scar that was a source of chronic pain was a serious medical condition). Plaintiff alleges, however, that Dr. Muthra prescribed treatment with a topical cream (fluocinolone acetonide), "tar shampoo," and lotion with vitamin E. Although Plaintiff contends that he was denied a biopsy, a dermatologist visit, and "over the counter drug[s] minoxidil, corticosteroid, [and] antholin for his scalp" (*id.* at 31), it is well established that "[d]isagreements over medications ... forms of treatment, or the need for specialists ... are not adequate grounds for a Section 1983 claim." *See Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001). Plaintiff's allegations are therefore insufficient to state a claim for deliberate indifference in connection with his hair loss or eczema.

### 3. Gynecomastia

Plaintiff alleges that while he was a pretrial detainee at Rockland County Jail, in 2005, he was prescribed a psychiatric drug (Rameron) that caused breast enlargement, known as gynecomastia. He was referred for a biopsy but was transferred to the custody of DOCCS in May 2005, before it took place. Plaintiff sues Rockland County for administering a drug that caused him harm.

Plaintiff's allegations might be construed as a claim for violation of the Fourteenth Amendment right to information about potential side effects of the medication. *See Pabon v. Wright*, 459 F.3d 241, 250-51 (2d Cir. 2006) ("In order to permit prisoners to exercise their right to refuse unwanted treatment, there exists a liberty interest in receiving such information as a reasonable patient would require in order to make an informed decision as to whether to accept or reject proposed medical treatment.").[5] Because Plaintiff alleges that he knew of this harm in 2005, it appears that his claim accrued at that time. The three-year limitations period for a section 1983 claim therefore barred this claim when he filed the complaint in 2022. Plaintiff should not replead this claim in his amended complaint, unless he can plead facts showing equitable tolling of the limitations period.

[5]   To establish a claim for violation of the Fourteenth Amendment right to medical information, "a prisoner must show that (1) government officials failed to provide him with such information; (2) this failure caused him to undergo medical treatment that he would have refused had he been so informed; and (3) the officials' failure was undertaken with deliberate indifference to the prisoner's right to refuse medical treatment." *Pabon*, 459 F.3d at 250-51.

Plaintiff alleges that the DOCCS and its Chief Medical Officer have denied treatment for gynecomastia on the ground that it is a cosmetic condition. In cases where a prisoner alleges that gynecomastia "significantly affects daily activities" or cause him "chronic and substantial pain," gynecomastia may qualify as a serious medical condition. *See, e.g., Blaine v. Burnes*, No. 3:20-CV-1039 (KAD), 2020 WL 5659101, at *6 (D. Conn. Sept. 23, 2020) ("While Gynecomastia can cause pain or discomfort, and can result in discharge from the nipple, [plaintiff] alleges none of these infrequent side effects."); *Washington v. Fludd*, 2019 WL 1643542, at *3 (dismissing plaintiff's Eighth Amendment claim based on gynecomastia as a Risperdal side effect for failure to allege facts sufficient to meet the objective component). Plaintiff's allegations are insufficient to show that his breast enlargement "significantly affects daily activities" or causes him "chronic and substantial pain." *Moore*, 2008 WL 4186340 at *6 (citing Brock, 315 F.3d at 162-63).

***9** Because Plaintiff may be able to allege facts showing that this is a sufficiently serious condition that is not merely cosmetic, and that defendants are actually aware that this condition is more than cosmetic, the Court grants Plaintiff leave to amend to replead this claim against Chief Medical Officer John Morley or other individuals who were personally aware of a serious medical condition related to Plaintiff's gynecomastia and were deliberately indifferent to the risk to him of serious harm.

### E. Leave to Amend

Plaintiff proceeds in this matter without the benefit of an attorney. District courts generally should grant a self-represented plaintiff an opportunity to amend a complaint to cure its defects, unless amendment would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Indeed, the Second Circuit has cautioned that district courts "should not dismiss

[a *pro se* complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)). Because Plaintiff may be able to allege additional facts to state a valid claim about his medical conditions, the Court grants Plaintiff 60 days' leave to amend his complaint to detail his claims.

Plaintiff is granted leave to amend his complaint to provide more facts about his claims. In the "Statement of Claim" section of the amended complaint form, Plaintiff must provide a short and plain statement of the relevant facts supporting each claim against each defendant. If Plaintiff has an address for any named defendant, Plaintiff must provide it. Plaintiff should include all of the information in the amended complaint that Plaintiff wants the Court to consider in deciding whether the amended complaint states a claim for relief. That information should include:

    a) the names and titles of all relevant people;

    b) a description of all relevant events, including what each defendant did or failed to do, the approximate date and time of each event, and the general location where each event occurred;

    c) a description of the injuries Plaintiff suffered; and

    d) the relief Plaintiff seeks, such as money damages, injunctive relief, or declaratory relief.

Essentially, Plaintiff's amended complaint should tell the Court: who violated his federally protected rights and how; when and where such violations occurred; and why Plaintiff is entitled to relief.

Because Plaintiff's amended complaint will completely replace, not supplement, the original complaint, any facts or claims that Plaintiff wants to include from the original complaint must be repeated in the amended complaint.

## CONCLUSION

Plaintiff is granted leave to file an amended complaint that complies with the standards set forth above. Plaintiff must submit the amended complaint to this Court's Pro Se Intake Unit within sixty days of the date of this order,

caption the document as an "Amended Complaint," and label the document with docket number 22-CV-1437 (LTS). An Amended Complaint form is attached to this order. No summons will issue at this time. If Plaintiff fails to comply within the time allowed, and he cannot show good cause to excuse such failure, the complaint will be dismissed for failure to state a claim upon which relief may be granted.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

**\*10** SO ORDERED.

Attachment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
Write the full name of each plaintiff.

_____ CV _____
(Include case number if one has been assigned)

-against-

AMENDED
COMPLAINT
(Prisoner)

Do you want a jury trial?
☐ Yes   ☐ No

_____
Write the full name of each defendant. If you cannot list the names of all the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section IV.

NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

Rev. 5/20/16

**I.    LEGAL BASIS FOR CLAIM**

State below the federal legal basis for your claim, if known. This form is designed primarily for prisoners challenging the constitutionality of their conditions of confinement; those claims are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "Bivens" action (against federal defendants).

☐ Violation of my federal constitutional rights

☐ Other:

**II.   PLAINTIFF INFORMATION**

Each plaintiff must provide the following information. Attach additional pages if necessary.

First Name          Middle Initial          Last Name

State any other names (or different forms of your name) you have ever used, including any name you have used in previously filing a lawsuit.

Prisoner ID # (if you have previously been in another agency's custody, please specify each agency and the ID number (such as your DIN or NYSID) under which you were held)

Current Place of Detention

Institutional Address

County, City                State                Zip Code

**III.  PRISONER STATUS**

Indicate below whether you are a prisoner or other confined person:

☐ Pretrial detainee
☐ Civilly committed detainee
☐ Immigration detainee
☐ Convicted and sentenced prisoner
☐ Other:

**IV.   DEFENDANT INFORMATION**

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1:

First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                State                Zip Code

Defendant 2:

First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                State                Zip Code

Defendant 3:

First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                State                Zip Code

Defendant 4:

First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                State                Zip Code

**V.    STATEMENT OF CLAIM**

Place(s) of occurrence:

Date(s) of occurrence:

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

**VI.   RELIEF**

State briefly what money damages or other relief you want the court to order.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.                    9

VII.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| Dated | | Plaintiff's Signature | |
| --- | --- | --- | --- |
| First Name | Middle Initial | Last Name | |
| Prison Address | | | |
| County, City | | State | Zip Code |

Date on which I am delivering this complaint to prison authorities for mailing: _____

Page 6

**All Citations**

Slip Copy, 2022 WL 953111

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1838277
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Michael WALKER, Plaintiff,

v.

CITY OF NEW YORK; Brooklyn Public Defenders
Office; Danielle Regis; New York City Police
Department; Detective Courtney Winston; Detective
Raymond Higgins; Detective Jason Guzman; Detective
Patrick Jean Pierre; Ranking Detective Daniel Pierrino;
Civil Complaint Review Board; Chairman Frank
Davie; Field Investigator A. Wassim; Panel Member
S. Carceterra; Panel Member M. Rivadene; Records
Access Officer George Alexander; Internal Affairs
Bureau; Captain Brian White; Lt. Dwayne Watson;
Sgt. Moode; Detective Carmelo Rivera; Detective
Rashad Vandross; Corporation Counsel Law Dept.;
Supervisor Nelson Genevieve; Daniel Oliner; Allyson
Nicole Brown; Christopher D. Deluca, Defendants.

20-CV-5240 (PKC) (LB)
|
Signed 05/07/2021

**Attorneys and Law Firms**

Michael Walker, Napanoch, NY, pro se.

## MEMORANDUM & ORDER

PAMELA K. CHEN, United States District Judge:

**\*1** Plaintiff Michael Walker, incarcerated at the Eastern New
York Correctional Facility, brings this *pro se* action under
42 U.S.C. §§ 1983, 1985, and 1986, the Americans with
Disabilities Act ("ADA") and Rehabilitation Act, and various
state-law provisions. Plaintiff's request to proceed *in forma
pauperis* ("IFP") is granted pursuant to 28 U.S.C. § 1915. For
the reasons discussed below, Plaintiff's Amended Complaint
(Dkt. 24-1) is dismissed in its entirety. Plaintiff is granted
sixty (60) days' leave to file a Second Amended Complaint
as set forth below.

## BACKGROUND

### I. Underlying Facts [1]

[1]    This recitation of the facts is based on the
non-conclusory allegations in the Complaint and
Amended Complaint, which the Court accepts
as true at this stage in the case, *see Milan v.
Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015) (per
curiam) (citation omitted), as well as the Court's
factual findings at the summary judgment stage in
*Walker v. Raja, see* 2020 WL 606788.

This case is related to Plaintiff's pending action in *Walker
v. Raja*, No. 17-CV-5202 (PKC) (LB) (E.D.N.Y. Aug. 22,
2017). [2] On January 8, 2017, Plaintiff was arrested following
an attempted armed robbery of a jewelry store. *Walker v.
Raja*, No. 17-CV-5202 (PKC) (LB), 2020 WL 606788, at \*1
(E.D.N.Y. Feb. 7, 2020). After an altercation during which
Plaintiff threatened the store owner and an employee with
a gun, Plaintiff fled the store with the jewelry and firearm.
*Id.* The store owner followed Plaintiff and wrestled him to
the ground, where the pair exchanged blows until civilian
bystanders intervened, grabbing Plaintiff and restraining him
on the pavement. *Id.*

[2]    In that lawsuit, Plaintiff has asserted § 1983 and
state-law claims against NYPD officers based on
the same attempted robbery incident that forms the
basis of this action.

Soon thereafter, several police officers from the New York
City Police Department ("NYPD") arrived at the scene. *Id.* In
their attempts to subdue and arrest Plaintiff, an officer struck
Plaintiff several times, and a female officer "began repeatedly
punching him in the face." *Id.* Plaintiff was charged with, *inter
alia*, robbery, assault, grand larceny, criminal possession of
a weapon, and criminal possession of stolen property. *Id.* at
\*2. He pled guilty to attempted robbery in the second degree
pursuant to New York Penal Law § 160.10(2)(a), and was
sentenced to 12 years to life as a "persistent violent felony
offender." *Id.*

Plaintiff had advanced glaucoma and distorted vision prior
to the January 8, 2017 arrest, but his vision became
completely impaired following the arrest. *Id.* Plaintiff is now
legally blind, and "cannot see, write, type, nor navigate
himself without the assistance of" auxiliary aids. (Amended
Complaint ("Am. Compl."), Dkt. 24-1, at 10.) Plaintiff also
suffers from post-traumatic stress disorder following the
arrest and, upon admission to the New York Department of
Corrections and Community Supervision ("DOCCS") local

county jail, was hospitalized in the medical unit due to medical complications. (*Id.* at 14–15.)

**\*2** Attorney Danielle Regis from the Brooklyn Defender Services[3] ("BDS") was assigned to represent Plaintiff in his criminal proceeding. (*Id.* at 15.) Around April 2017, Regis visited Plaintiff in DOCCS confinement, accompanied by a social worker. (*Id.*) During the visit, Regis played back the surveillance tape from Plaintiff's arrest, verbally describing the video to Plaintiff due to his visual impairment. (*Id.* at 16.) In the video, the arresting officers were subduing Plaintiff and striking him "until incoherent," including NYPD Officer Elisa Battista, who was "seen repeatedly striking [P]laintiff's head[.]" (*Id.* at 16.) Regis "immediately shut[ ] off [the] video" in the middle of playback, which Plaintiff characterizes as "a conscious disregard in preventing [P]laintiff any further information due to overwhelming exculpatory impeaching evidence, enough for criminal charges being brought on [the] seven arresting officers." (*Id.*) Plaintiff thereafter requested access to the surveillance tape several times to "[n]o avail," which he claims is due to Regis's "derelict tactics to insulate [the] seven arresting officers." (*Id.*)

[3]   Though Plaintiff refers to the "Brooklyn Public Defender Office" in his Complaint (*see, e.g.*, Complaint ("Compl."), Dkt. 1, at 10), the Court assumes Plaintiff meant to name Brooklyn Defender Services, a non-profit public defender organization, *see* http://bds.org/ (last visited Mar. 3, 2021), and refers to the organization by its correct name.

On or about May 12, 2017, Plaintiff filed a Notice of Claim with the New York State Office of the Comptroller concerning state-law claims arising from his January 2017 arrest.[4] (*see id.* at 17;) *see also Walker*, 2020 WL 606788, at *2. Plaintiff also filed a "[p]etition with the (DOJ) Dept[.] of Justice (Southern District)" on May 6, 2017, a citizen's complaint with the Civilian Complaint Review Board ("CCRB")[5] on May 18, 2017, and a citizen's complaint with the NYPD's Internal Affairs Bureau ("IAB")[6] on June 6, 2017. (*See* Am. Compl., Dkt. 24-1, at 17.) On August 22, 2017, Plaintiff filed a *pro se* action against NYPD Officers Taimur Raja, David Vazquez, Estharlin Lopez, and Kyle Brown, advancing claims under 42 U.S.C. § 1983 and state law in connection with his January 2017 apprehension and arrest. *See* Complaint, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Aug. 22, 2017), ECF No. 2; *see also Walker*, 2020 WL 606788, at *2.

[4]   The Comptroller's Office informed Plaintiff on or about May 24, 2017 that his claim was denied as untimely because it had not been filed within 90 days from the date of his January 8, 2017 arrest. *Walker*, 2020 WL 606788, at *2.

[5]   The CCRB is an independent City agency "empowered to receive, investigate, mediate, hear, make findings, and recommend action on complaints against New York City police officers." *Joseph v. Doe*, No. 16-CV-2004 (PKC) (LB), 2017 WL 4233024, at *2 n.3 (E.D.N.Y. Sept. 22, 2017).

[6]   The IAB is a division of the NYPD that "investigates claims of serious misconduct and corruption of members of the NYPD." *Floyd v. City of New York*, 739 F. Supp. 2d 376, 379 (S.D.N.Y. 2010); *see id.* at 384 ("IAB investigations are confidential, including within the NYPD.").

## II. *Walker v. Raja*

The New York City Office of Corporation Counsel ("Corporation Counsel") represents the arresting officers in *Walker v. Raja*, which is still pending before this Court. Previously, Allyson Brown, an attorney with Corporation Counsel, requested a stay of the proceedings in light of the pending CCRB investigation. (Am. Compl., Dkt. 24-1, at 18;) *see also* Motion to Stay, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Nov. 2, 2017), ECF No. 19; 11/6/2017 Order, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Nov. 6, 2017), ECF No. 21. On June 12, 2018, following an 18-month investigation and hearing in front of a three-member panel,[7] the CCRB "exonerated [the] five arresting officers[,]" Raja, Brown, Vazquez, Lopez, and Sgt. Rahman. (Am. Compl., Dkt. 24-1, at 18.) The stay in *Walker v. Raja* was lifted, and the case proceeded to discovery. (*Id.* at 18;) *see also* 8/7/2018 Order, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Aug. 7, 2018), ECF No. 51.

[7]   The panel consisted of CCRB chairman Frank Davie and CCRB members S. Carceterra and M. Rivadene. (Am. Compl., Dkt. 24-1, at 18.)

**\*3** During discovery, Plaintiff received the CCRB investigative records and learned that there were seven NYPD officers involved in his arrest, not five, as he had previously thought. (Am. Compl., Dkt. 24-1, at 19.) According to Plaintiff, when questioned by the Court as

to whether there were other arresting officers that should have been added to the complaint, Corporation Counsel attorney Brown "strategically respon[ded][ ] by mentioning only[ ] (Sgt. Rahman) with a conscious disregard [in] excluding arresting officers ... [William Chow and Elisa Battista] ... when having constructive knowledge of direct participation [by] all seven arresting officers." (*Id.* at 19.) Plaintiff claimed that Brown failed to mention Officers Chow and Battista in order to cover up the CCRB's "mishandling [of] investigations in disavowing information while deleting arresting officers police misconduct ... which result[ed] in [the] same two arresting officers [being] intentionally excluded from the" CCRB decision. (*Id.* at 19–20.) Plaintiff also alleged that BDS attorney Regis had seen Officers Chow and Battista on the surveillance tape during her visit with Plaintiff in April 2017, but hid their involvement from Plaintiff. (*Id.* at 20.) Plaintiff further claimed that he later learned through discovery that "the video surveillance tape, audio and investigative records sent by [the City], [BDS], Brooklyn District Attorney['s] Office and Corporation Counsel law dept [had been] doctor[ed], deleting [the] arresting officers['] police misconduct[.]" (*Id.*) Plaintiff believed that the "records, videos, and audio[ ]" provided to Plaintiff and the Court were "doctored when sent during discovery." (*Id.* at 21–22 (asserting that Defendants were "banking on [P]laintiff's disability" and "hinder[ing] him from exercising his Civil Rights").) According to Plaintiff, the original video surveillance tape showed Officer Battista "kneeling over [P]laintiff in a malicious assault," and an audio file depicted Officer Vazquez stating that "he [had] used physical force on [P]laintiff," but both files had been deleted, "along with missing investigative records concerning direct participation[.]" (*Id.* at 20.)

On November 6, 2018, the Court granted Plaintiff leave to file an amended complaint. (Dkt. 62.) The Amended Complaint additionally named as defendants NYPD Officers William Chow and Elisa Battista, Sergeant Sazedur Rahman, and the City of New York (the "City"). [8] Amended Complaint, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Oct. 31, 2018), ECF No. 61; 11/6/2018 Order, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Nov. 6, 2018), ECF No. 62. On February 7, 2019, Plaintiff filed a motion to compel, in which he raised the issue of the allegedly altered videos, asserting that the "CCRB and Corporation Counsel have in their po[ss]ession video record evidence of ... facts of police criminal misconduct." Motion to Compel, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Feb. 7, 2019), ECF No. 86, at 1. In response, Corporation Counsel explained that:

> Defendants produced copies of these videos to Plaintiff in their original form as received by [Corporation Counsel], and were not altered in any way by this Office. Additionally, Defendants attach hereto as Exhibit B a video of the underlying incident received from the Kings County District Attorney's Office, which is an incomplete version of the video from Brooklyn Defender Services that was previously provided to Plaintiff during discovery and to the Court on December 22, 2017.

Response to Motion to Compel, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Feb. 22, 2019), ECF No. 91, at 1–2. [9] In its partial grant of summary judgment, the Court briefly addressed this argument and found it "not cognizable," given that "Plaintiff offer[ed] no record evidence to suggest that the video evidence [had been] doctored." *Walker*, 2020 WL 606788, at *3 n.6.

[8]    In his Amended Complaint in *Walker v. Raja*, Plaintiff set forth his theories about the video alterations and omission of Officers Chow's and Battista's identities from the defendants' initial disclosures. *See, e.g.*, Amended Complaint, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Oct. 31, 2018), ECF No. 61, at 3 ("Plaintiff states that police officer Battista [ ] somehow was not mentioned within [the initial disclosures] but was present during [P]laintiff['s] assault and arrest.... In addition[,] in and around April of 2017[,] [P]laintiff, defense attorney, and [a] social worker viewed a record of a female officer [ ] assaulting [P]laintiff[.] [T]his video record is missing as evidence and has yet to surface[ ].... Battista[ ] somehow disappear[ed] from [the] CCRB investigation completely[.]"), 12 ("Police officer Battista was not included but is an Arresting officer present at the scene.").

[9]    Plaintiff alleges that, in response to his raising of the issue of doctored videos in *Walker v. Raja*, Corporation Counsel stated that it was the Kings County District Attorney's Office that had deleted portions of the video surveillance

tape, not Corporation Counsel. (Compl., Dkt. 1, at 15 (referring to the "Brooklyn" District Attorney's Office, which is the Kings County District Attorney's Office).) Although Corporation Counsel's above statement from its response to the motion to compel, *Walker v. Raja*, No. 17-CV-5202, Dkt. 91, at 1–2, does indicate that the copy of the video sent by the District Attorney's Office to Corporation Counsel was "incomplete" when compared to the BDS version provided to Plaintiff and the Court, that does not mean that the District Attorney's Office "doctored" the video; rather, it means only that the Office did not provide the entire video to Corporation Counsel. "Incomplete" is not the same as "doctored" or equivalent to altering images. Indeed, contrary to Plaintiff's contention, he received the entire video from BDS in discovery, and there is no basis for Plaintiff's claim that any party "doctored" video evidence in *Walker v. Raja*.

**\*4** Plaintiff also moved for sanctions against the CCRB and Corporation Counsel, [10] *see* Motion for Sanctions, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Mar. 4, 2019), ECF No. 93, which the Honorable Lois Bloom denied on the grounds that there was "no record evidence that [D]efendants [had] disobeyed a discovery order or engaged in sanctionable conduct. Defendants have provided the videos to plaintiff as they were received by their office," 4/2/2019 Order, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Apr. 2, 2019), ECF No. 95.

[10]    In a submission filed April 1, 2019, Plaintiff asserted that, though Defendants "produced 3 doctored video segments" during discovery, "the building where the incident occurred had an adjoining store," which "had at least one other camera that would have recorded a more concise detailed description concerning relevant footage of [Officer] Vazquez strategically taking a firearm from a civilian then carefully planting [the] firearm near plaintiff['s] feet as he is beaten by other defendants." Plaintiff's Supportig Evidence, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Apr. 1, 2019), ECF No. 94, at 5. Plaintiff claimed that he "attempted to obtain this footage on multiple occasions[,] but was unsuccessful due to preventive tactics by counsel for the defendants." (*Id.*)

The parties cross-moved for summary judgment, and by Memorandum and Order on February 7, 2020, the Court denied Plaintiff's motion and partially granted and denied Defendants' motion, dismissing some of Plaintiff's claims. *Walker*, 2020 WL 606788, at \*13. That case is pending trial as to the few remaining claims, *i.e.*, claims for excessive force and failure to intervene as to Defendants Raja, Vazquez, Brown, Chow, and Battista, and failure to supervise as to Defendant Rahman. [11] *See id.* In anticipation of trial, the Court, *inter alia*, granted the defendants' motion in limine to preclude Plaintiff "from proffering any evidence to suggest that any material was doctored in this matter." Court's Motions *in Limine* Chart, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Aug. 11, 2020) ECF No. 144, at 2, #9.

[11]    On April 12, 2021, the Court referred the case to the Trial Ready Rapid Mediation Program, and requested the ADR Department to secure pro bono counsel for Plaintiff. *See* 4/12/2021 Order, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Apr. 12, 2021).

Plaintiff filed the instant action thereafter.

### III. The Instant Action

On October 29, 2020, Plaintiff commenced the instant action against the City, BDS, the CCRB, the IAB, and Corporation Counsel based on the alleged misconduct relating to investigations into his January 2017 arrest and the discovery process in *Walker v. Raja*. (Compl., Dkt. 1.) On January 21, 2021, Plaintiff filed a submission entitled "Amended Complaint," consisting of three pages summarizing the exhibits he seeks to incorporate in his Complaint. (Dkt. 21.) On February 9, 2021, Plaintiff filed the Amended Complaint, adding as defendants the NYPD and individual employees of the NYPD, CCRB, and Corporation Counsel in their individual and official capacities. [12] (*See generally* Am. Compl., Dkt. 24-1.)

[12]    Specifically, Plaintiff seeks to bring claims against Detective Courtney Winston, Detective Raymond Higgins, Detective Jason Guzman, Detective Patrick Jean Pierre, and Ranking Detective Daniel Perrino of the NYPD's 70th Precinct; Chairman Frank Davie and employees A. Wassim, S. Carceterra, M. Rivardene, and Records Access Officer Alexander George of the CCRB; Captain Brian White, Lieutenant Dwayne Watson, Sergeant Moode, Detective Carmelo Rivera, and Detective Rashad Vandross of the NYPD's IAB and 67th precinct; and Corporation Counsel attorneys

Nelson Genevieve, Daniel H. Oliner, Allyson Nicole Brown, and Christopher D. Deluca.

**\*5** For the reasons discussed below, the Court dismisses the Amended Complaint in its entirety, and grants Plaintiff leave to file a Second Amended Complaint within sixty (60) days.

## LEGAL STANDARD

A complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A document filed *pro se* is to be liberally construed, and "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Ceara v. Deacon*, 916 F.3d 208, 213 (2d Cir. 2019) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). "If [a] liberal reading of the complaint gives any indication that a valid claim might be stated, the Court must give the plaintiff an opportunity to amend the complaint." *Nelson-Charles v. U.S. Dep't of Educ.*, No. 19-CV-1616 (PKC) (PK), 2019 WL 1675999, at \*2 (E.D.N.Y. Apr. 16, 2019) (internal quotation marks omitted) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).

Title 28 of the United States Code § 1915A requires this Court to review the complaint in a civil action in which a prisoner seeks redress from a governmental entity or from officers or employees thereof, and to "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007). Similarly, pursuant to the IFP statute, a district court must dismiss a case if the court determines that the complaint "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

## DISCUSSION

Although Plaintiff's Amended Complaint is slightly confusing in that he frequently references legal phrases

without substantively elaborating on his allegations, he appears to center his claims on five main theories: (1) the CCRB and IAB failed to properly investigate his claims against his arresting officers, and the City, CCRB, IAB, Corporation Counsel, and BDS subsequently conspired to cover up the mishandled investigation by destroying video evidence and failing to disclose the identities of Officers Chow and Battista in *Walker v. Raja*; (2) NYPD officers pressured witnesses and covered up evidence in the lead-up to Plaintiff's grand jury indictment; (3) the City's failure to train led to the foregoing violations; (4) the City and BDS failed to accommodate Plaintiff's visual impairment during his underlying criminal proceedings; and (5) the City failed to establish an independent commission to investigate Plaintiff's claims against his arresting officers. Based on these factual allegations, Plaintiff asserts claims pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 against the City, the NYPD, individual NYPD officers, BDS, BDS attorney Regis, the CCRB, CCRB employees, the IAB, IAB employees, Corporation Counsel, and Corporation Counsel attorneys; claims pursuant to Title II of the ADA and the Rehabilitation Act against the City, BDS, and BDS attorney Regis; and state-law claims against the City. (Am. Compl., Dkt. 24-1, at 23–43.) [13]

[13]     Though not distinguishing between claims under Section 1983 and state law, Plaintiff explains that he "asserts the following thirteen Counts of which all are amongst defendants": (1) deliberate indifference, (2) negligence, (3) conspiracy, (4) failure to intervene, (5) fraudulent misrepresentation or deception, (6) abuse of process, (7) intentional infliction of emotional distress, (8) equitable estoppel, (9) due process, (10) equal protection, (11) procedural due process, (12) fabrication of evidence and failure to investigate, and (13) substantive due process. (Dkt. 26, at 4.)

## I. Section 1983

**\*6** 42 U.S.C. § 1983 ("Section 1983") "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 438 (E.D.N.Y. 2012) (quoting *Baker v. McCollan*, 443 U.S 137, 144 n.3 (1979)); *accord Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). In order to maintain a civil rights action under Section 1983, a plaintiff must allege two essential elements. First, the conduct challenged must have been "committed by a person

acting under color of state law[.]" *Cornejo*, 592 F.3d at 127 (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)); *see also Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) ("[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." (internal quotation marks and citation omitted)). Second, the conduct complained of "must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo*, 592 F.3d at 127; *see also Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999).

### A. Claims Against the NYPD, IAB, CCRB, and Corporation Counsel

As an initial matter, claims against agencies of the City of New York, including the NYPD, IAB, the CCRB, and Corporation Counsel, are not allowed, and instead, must be brought against the City of New York. *See* N.Y.C. Charter, ch. 17, § 396 ("[A]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."); *Ojeda v. Mendez*, No. 20-CV-3910 (EK) (LB), 2021 WL 66265, at *3 (E.D.N.Y. Jan. 7, 2021) (dismissing claims against, *inter alia*, the NYPD and IAB as non-suable entities (citing N.Y.C. Charter, ch. 17, § 396)); *Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007) ("[T]he NYPD is a non-suable agency of the City." (citation omitted)); *Wingate v. City of New York*, No. 14-CV-4063 (ARR) (LB), 2018 WL 3863439, at *10 (E.D.N.Y. Aug. 14, 2018) ("Plaintiff's claims against Corporation Counsel ... are dismissed because [it is] not [a] suable entit[y]." (citing, *inter alia*, N.Y.C. Charter ch. 17, § 396)).

Therefore, Plaintiff's claims against the NYPD, the IAB, the CCRB, and Corporation Counsel are dismissed for failure to state a claim.

### B. Claims against BDS and BDS Attorney Regis

Plaintiff's Section 1983 claims against BDS and BDS attorney Regis also must be dismissed. Though BDS and Regis were appointed by the state court as Plaintiff's counsel in his underlying criminal case, as a general matter, Plaintiff cannot sue his public defender under Section 1983. *see Polk County. v. Dodson*, 454 U.S. 312, 324–25 (1981) (holding that public defenders do not act under color of law when they represent defendants and are not subject to suit under Section 1983); *Rodriguez v. Weprin*, 116 F.3d 62, 65–66 (2d Cir.

1997) ("[C]ourt-appointed attorneys performing a lawyer's traditional functions as counsel to defendant[s] do not act 'under color of state law' and therefore are not subject to suit under 42 U.S.C. § 1983." (internal citation omitted)).

> Absent special circumstances suggesting concerted action between an attorney and a state representative, the representation of a defendant by private counsel in state criminal proceedings does not constitute the degree of state involvement or interference necessary to establish a claim under § 1983, regardless of whether that attorney is privately retained, court-appointed, or employed as a public defender.

*Liverpool v. City of New York*, No. 19-CV-5527 (CM), 2019 WL 3745734, at *2 (S.D.N.Y. Aug. 7, 2019) (citing, *inter alia*, *Nicholas v. Goord*, 430 F.3d 652, 656 n.7 (2d Cir. 2005)); *see also id.* at *3 (noting that the plaintiff "has not stated a § 1983 claim against" a BDS attorney, who is a "private part[y] who do[es] not work for any state or other government body"). Although Plaintiff claims that BDS attorney Regis prevented Plaintiff from seeing and accessing certain surveillance tape evidence in an effort to "insulate [the] seven arresting officers" (Am. Compl., Dkt. 24-1, at 16), these claims neither sufficiently allege "concerted action" between Regis and "state representatives," nor are they supported by any factual allegation in the Complaint or Amended Complaint. Given the wholly conclusory nature of Plaintiff's assertion that Defendant Regis sought to protect the arresting officers, the Court cannot find any "special circumstance" that justifies deviating from the fundamental principle that Plaintiff's court-appointed defense counsel cannot be sued as state actors under Section 1983.

**\*7** Therefore, Plaintiff's Section 1983 claims against BDS and Regis are dismissed for failure to state a claim.

### C. Claims Against NYPD Officers

When asserting claims under Section 1983 against government officials, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v.*

*Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). In connection with his claims against NYPD 70th Precinct Detectives Winston, Higgins, Guzman, Jean Pierre, and Perrino, Plaintiff alleges that the detectives,

> acting under the color of state law, also as arms to the (NYPD), in concert with the [BDS], in a Sin Qua Non to insulate seven arresting officers police misconduct by suppressing exculpatory impeaching evidence, falsifying arrest reports, and allowing inadmissible tainted / manufactured evidence during plaintiff's grand jury proceedings. [The detectives] amplified their conduct by excluding two crucial arresting officers, (William Chow) [ ], (Elisa Battista) police misconduct, obstructed the due course of justice. [The detectives] dissuaded arresting officers from telling the truth during secretive meeting of the minds, while forwarding false reports to the grand jury resulting in perjury of witnesses to deprive, oppress, annoy, wantonly motivated to do plaintiff harm in order to insulate seven arresting officers['] police misconduct in order to obtain a collateral objective that's outside legitimate ends of process.

(Am. Compl., Dkt. 24-1, at 27–28.) [14] As to supervisory officers Captain White, Lieutenant Watson, and Sergeant Moode, Plaintiff alleges simply that they "failed t[o] intervene to prevent such violations [by the IAB] from occurring[,] resulting in injuries of fraudulent concealment [and] [subjecting] [P]laintiff [to] discovery harm that was suffered in deception to delay in bring[ing] [ ] suit by keeping investigation reports from [P]laintiff." (*Id.* at 39.)

[14]  In an affirmation attached to his Amended Complaint, Plaintiff asserts further allegations against Detectives Winston, Higgins, Guzman, Jean Pierre, and Perrino, but these allegations are

similarly vague and fail to allege the detectives' personal involvement. (*See* Dkt. 24-2, at 3–7.)

To the extent Plaintiff argues that his arrest and criminal charges were premised on the presentation of "manufactured evidence" during grand jury proceedings, the Court already dismissed such a claim in *Walker v. Raja*, finding that "the evidence overwhelmingly supports a finding that Plaintiff robbed the store with a firearm," and thus Plaintiff cannot establish that "fabricated evidence le[d] to a false charge against him." *See* 2020 WL 606788, at *10. Furthermore, to the extent this claim calls into question the validity of Plaintiff's conviction, it is barred by the favorable termination rule set forth in *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994), which holds that a state prisoner's Section 1983 action is barred if success in that action would necessarily demonstrate the invalidity of a criminal conviction or sentence. *see* *Wilkinson v. Dotson*, 544 U.S. 74, 81–82 (2005) ("[A] state prisoner's § 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—if success in that action would necessarily demonstrate the invalidity of confinement or its duration." (emphasis removed)). Lastly, Plaintiff's general, conclusory statements fail to allege the individual officers' personal conduct that led to the deprivation of Plaintiff's constitutional rights. In fact, Plaintiff fails to state *any* factual allegations as to Detectives Rivera and Vandross of the 67th precinct, despite naming them as Defendants in the Amended Complaint.

**\*8**  Plaintiff's claims against the individual NYPD officers of the 70th Precinct are thus dismissed, with leave to replead facts relating to their individual conduct, provided that any repleaded allegations do not relate to the due-process claim the Court has already dismissed in *Walker v. Raja. See* 2020 WL 606788, at *10.

### D. Claims against CCRB Employees

To the extent Plaintiff brings claims against CCRB employees —Chairman Frank Davie, employees A. Wassim and George Alexander, and panel members M. Rivardene and S. Carceterra—for their involvement in the allegedly defective investigation into Plaintiff's arresting officers, the claims are dismissed for lack of personal involvement and for failure to state a claim. First, with respect to Defendants Davie, Alexander, Rivardene, and Carceterra, Plaintiff alleges only that they participated in the CCRB's decision absolving the

2021 WL 1838277

arresting officers of responsibility, which, in itself, does not constitute a violation of Plaintiff's rights. As to CCRB investigator A. Wassim, Plaintiff alleges:

> (CCRB) field investigator, (A. Wassim) interrogated plaintiff's Brooklyn Public Defender, (Danielle Regis) and with a conscious disregard withheld records of interrogations, an overt act in concealing meetings of the minds that exhibited deliberate indifference by turning their heads to the obvious by disavowing, exculpatory, probative, impeaching evidence in interference with state and federal Court proceedings, unlawful actions motivated by an intent to deprive plaintiff Equal protection of the laws. Defendants refrained and dissuaded arresting officers from giving the truth, concerning accurate statements involving the plaintiff incident on, (Jan 8. 2017) resulting in false oral and written statements preventing an honest investigation when false and defamatory statements of facts in their final determination caused a deprivation of plaintiff's civil rights, pursuant to, 42 USC § 1985, while inconsistent with the, IAB investigation holding a different set of arresting officers in their investigation, violation of plaintiff's Due process. Private actors acted in concert with the IAB and Corporation Counsel to inflict an unconstitutional Injury, causing damages[.]

(Am. Compl., Dkt. 24-1, at 33.) Beyond the conclusory statements couched in legal terminology, Plaintiff has failed to explain exactly what "truth" Defendant Wassim dissuaded the officers from telling, and what "false and defamatory statements" were induced. Without more, the claim against Defendant Wassim cannot proceed.

Furthermore, Plaintiff fails to allege the violation of any constitutional right in connection with the CCRB investigation and final decision. "It is well[-]established that there is no constitutional right to an investigation by government officials." *Troy v. City of New York*, No. 13-CV-5082 (AJN), 2014 WL 4804479, at *6 (S.D.N.Y. Sept. 25, 2014) (internal quotations, alterations, and citations omitted); *see also Koulkina v. City of New York*, 559 F. Supp. 2d 300, 316 (S.D.N.Y. 2008) ("[T]here is no federal constitutional right to a[ ] [CCRB] investigation." (citing *Blount v. Swiderski*, No. 03-CV-0023 (ENV), 2006 WL 3314635 at *12 (E.D.N.Y. Nov. 14, 2006)); *McCaffrey v. City of New York*, 2013 WL 494025, at *5 (S.D.N.Y. Feb. 7, 2013) ("[A] 'failure to investigate' is not independently cognizable as a stand-alone claim[.]"). Plaintiff thus lacks an actionable claim against the CCRB, the IAB, and their employees for allegedly failing to investigate his claims against the arresting officers.

**\*9** Therefore, Plaintiff's claims against CCRB Chairman Davie, employees A. Wassim and George Alexander, and panel members M. Rivardene and S. Carceterra are dismissed.

### E. *Monell* Claims Against the City

Plaintiff alleges that the City failed to protect his constitutional rights by, *inter alia*, "fail[ing] to train and supervise" its employees, "creating and contin[uing] in policies or customs upon having a conscious disregard in private and government municipalities in protecting plaintiff's (Const Rights)," and failing to

> set[ ] in place a Commission (Watchdog agency) in preventing private and government entity's in mishandling, and disavowing information involving seven arresting officers police misconduct, revealed upon their investigative work (Collectively) by subpoenaing records resulting in overt acts by withholding, Aided cards, doctor[ing] investigative records, video surveillance tapes, TRI audio radio runs, and disciplinary records[.]

(Am. Compl., Dkt. 24-1, at 23–25.)

Plaintiff's claims against the City of the New York cannot proceed. A municipality can be liable under Section 1983 if the plaintiff can show that a municipal policy or custom caused the deprivation of his constitutional rights. *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). Four types of practices may give rise to a Section 1983 claim against a municipality:

> (1) a formally adopted municipal policy; (2) the actions or decisions of a municipal official with final policymaking authority; (3) a practice so persistent and widespread that it constitutes a custom or usage; and (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference.

*Doe v. City of New York*, No. 18-CV-670 (ARR) (JO), 2018 WL 3824133, at *8 (E.D.N.Y. Aug. 9, 2018) (internal quotation marks and citation omitted); *Safran v. Singas*, No. 20-CV-4537 (PKC) (SMG), 2020 WL 7125232, at *4 (E.D.N.Y. Dec. 4, 2020) (citation omitted). Critically, "a prerequisite to municipal liability under *Monell* is an underlying constitutional violation by a state actor." *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 567 (S.D.N.Y. 2010). As the Second Circuit has noted, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006); *see also id.* (noting that once a "district court properly [finds] no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* [is] entirely correct").

### 1. Underlying Constitutional Violation

Plaintiff purports to bring claims under the Sixth, Fifth, and Fourteenth Amendments, but fails to allege constitutional violations by any state actor.

Plaintiff fails to state a Six Amendment claim.

To prevail on a claim for denial of the constitutional right to a fair trial, a plaintiff must demonstrate that "(1) an investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result."

**\*10** *Case v. City of New York*, 408 F. Supp. 3d 313, 322–23 (S.D.N.Y. 2019) (quoting *Caravalho v. City of New York*, 732 F. App'x 18, 24 (2d Cir. 2018) (summary order)). The fabricated information must be "both falsed and likely to influence a jury's decision." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016). Plaintiff has failed to sufficiently allege any element of a Sixth Amendment violation. As discussed, he offers only conclusory assertions that evidence was "manufactured" by NYPD officers and others without providing any factual allegations to support these claims, such as what evidence was allegedly fabricated and forwarded to prosecutors, by whom, and when, and how that evidence might have affected a jury's verdict. Furthermore, to the extent Plaintiff alleges that NYPD officers mishandled investigations leading up to his criminal charges, "in the context of § 1983, allegations of officers' failure to investigate are considered under the rubric of false imprisonment, false arrest, or malicious prosecution." *Campbell v. Giuliani*, No. 99-CV-2603 (JG), 2000 WL 194815, at *3 n.6 (E.D.N.Y. Feb. 16, 2000) (citing *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 135 (E.D.N.Y. 1998)); *see also Luck v. Westchester Med. Ctr.*, No. 17-CV-9110 (NSR), 2020 WL 564635, at *7 (S.D.N.Y. Feb. 4, 2020) (collecting cases). For the same reasons set forth in *Walker v. Raja*, Plaintiff fails here too to state a claim for false imprisonment, false arrest, or malicious prosecution. Thus, Plaintiff's Sixth Amendment claims are dismissed.

As to any Fifth Amendment claims Plaintiff seeks to bring, the "Fifth Amendment only applies to claims against the federal government," and not the Defendants in this case. *see Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 412 n.1 (S.D.N.Y. 2013). Any Fifth Amendment claims are thus dismissed.

Plaintiff's claims of Fourteenth Amendment violations pursuant to Section 1983 are also dismissed for failure to state a claim. First, to the extent Plaintiff alleges an equal-protection violation, he has failed to make the requisite factual allegations. "To prove a violation of the Equal Protection Clause ... [,] a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination ... [and] that the

disparity in treatment cannot survive the appropriate level of scrutiny[.]" *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (citations omitted). Plaintiff has not alleged facts from which to infer that Defendants acted with any racial or otherwise impermissible animus, or that Plaintiff was treated differently from any similarly situated persons.

Furthermore, as discussed above, to the extent Plaintiff argues that his procedural due process rights were violated by the mishandling of investigations into his claims against the officers by the CCRB, the IAB, and their employees, these allegations do not give rise to a constitutional violation. *See supra* Section I.D.

Nor does the alleged withholding of evidence and alteration of video surveillance footage in *Walker v. Raja* amount to a constitutional violation. Though Plaintiff alleges that Defendants withheld evidence regarding Officers Chow's and Battista's involvement in the January 2017 altercation, Plaintiff faced no barriers in adding Officers Chow and Battista as Defendants in his amended complaint in *Walker v. Raja*. In fact, the excessive force claims in that case against the NYPD Officers, including Officers Chow and Battista, are currently pending trial. Though Plaintiff was not able to name Officers Chow and Battista as defendants as early as he otherwise may have liked, this delay does not violate Plaintiff's constitutional rights. *Cf. Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) ("Mere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." (internal quotations and citation omitted)); *see also Smith v. Annucci*, No. 18-CV-1107 (DNH) (DJS), 2019 WL 11727264, at *4–5 (N.D.N.Y. Jan. 16, 2019) ("A hypothetical injury is not sufficient to state a claim for violation of the right of access to the courts. Instead, a plaintiff must demonstrate actual injury by establishing that the denial hindered his efforts to pursue a non-frivolous legal claim." (internal quotations and citations omitted)).

*11 Finally, to the extent Plaintiff wishes to hold the Defendant NYPD Officers and/or Corporation Counsel accountable for "derelict tactics" during discovery, the correct mechanism through which to do so is moving for sanctions in that case, which Plaintiff has already, albeit unsuccessfully, done. *See* Motion for Sanctions, *Walker v. Raja*, No. 17-CV-5202 (PKC) (LB) (E.D.N.Y. Mar. 4, 2019), ECF No. 93; 4/2/2019 Order, *Walker v. Raja*, No. 17-CV-5202 (PKC) (LB) (E.D.N.Y. Apr. 2, 2019), ECF No. 95. And as discussed above, the issue of the allegedly doctored video evidence

was addressed and rejected by the Court in *Walker v. Raja*. *See, e.g.*, *Walker*, 2020 WL 606788, at *3 n.6; Transcript of 8/11/2020 Pretrial Conference, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Aug. 11, 2020), at 25:15–24 (the Court stating: "The bottom line is I have not seen any evidence, Mr. Walker, about the tapes to show that this tape has been doctored. I have viewed the video surveillance a number of times and it certainly depicts the event that you are complaining about in which you say that the officers use excessive force. And obviously, I relied in part o[n] my viewing of that video surveillance to allow your excessive force claim to go through. So at this point, again I will just reiterate, that I do not see any basis for your claim that the video surveillance footage was doctored.").

In sum, Plaintiff has failed to sufficiently allege a constitutional violation by any state actor, which, in itself, requires dismissal of his *Monell* claims against the City.

### 2. Custom or Policy

Even if this were not the case, the allegations in Plaintiff's Amended Complaint do not give rise to a *Monell* claim against the City. Plaintiff proffers two theories of liability against the City under *Monell*: that the City (1) failed to train and supervise its employees, exhibited deliberate indifference to Plaintiff's rights, and created a policy or custom that resulted in the deprivation of Plaintiff's rights (Am. Compl., Dkt. 24-1, at 23–24); and (2) consciously disregarded Plaintiff's equal-protection and due-process rights, and rights under the ADA, by failing to establish an independent Commission to investigate Plaintiff's claims against the officers (*id.* at 24–25). (*see also id.* at 14 ("Plaintiff advance[s] two theories of municipal liability. First asserts that the City has a custom of zealously promoting debating science in mishandling investigations failed to train employees[.]")

However, Plaintiff offers only conclusory statements in support of his claims that the City failed to train and supervise its employees or created a policy or custom that resulted in the deprivation of Plaintiff's rights. (*See, e.g.*, Am. Compl., Dkt. 24-1, at 23–24.) Plaintiff argues, for example, that the City "knew of the moral certain[t]y that private and government superiors and their subordinates would acquire legally blind individuals (clients)," and that the failure to train subordinates pursuant to the ADA "will virtually always lead to a substantial violation[ ], in Due process [and] Equal protection[.]" (*Id.* at 12.) Plaintiff also

argues that the City failed to properly train its agencies, presumably the CCRB and the IAB, "in handling police misconduct allegations and records," thereby insulating the seven arresting officers and violating Plaintiff's Fourth and Fourteenth Amendment rights. (*Id.* at 13.) Such "boilerplate assertion[s]" are insufficient to state a *Monell* claim. *see Dumel v. Westchester County*, No. 19-CV-2161 (KMK), 2021 WL 738365, at *6 (S.D.N.Y. Feb. 25, 2021) (collecting cases); *Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 540 (S.D.N.Y. 2012) (same). Nor does the decision against establishing an independent Commission (*e.g.*, Am. Compl., Dkt. 24-1, at 24–25)—a discretionary choice by the City— arise to a conscious disregard of Plaintiff's rights. *see Doe*, 2018 WL 3824133, at *8.

Therefore, Plaintiff's *Monell* claims against the City are dismissed for failure to state a claim. *see Johnson v. City of New York*, No. 18-CV-4030 (MKB), 2020 WL 249100, at *2 (E.D.N.Y. Jan. 16, 2020) (dismissing a *Monell* claim because the plaintiff failed to allege facts "to support an inference that the City had an official policy or custom that caused a violation of any federally protected right").

## II. Sections 1985 and 1986

**\*12** To the extent Plaintiff alleges a conspiracy to deprive him of constitutional rights under Sections 1985 and 1986, those claims are dismissed as to all Defendants.

> To state a civil rights conspiracy under § 1985(3), a plaintiff must allege: 1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. A section 1985(3) conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.

*Britt v. Garcia*, 457 F.3d 264, 270 n.4 (2d Cir. 2006) (internal quotations and citations omitted); *see also Brito v. Arthur*, 403 F. App'x 620, 621 (2d Cir. 2010) (summary order) ("To state a conspiracy claim under 42 U.S.C. § 1985, Appellant must have alleged: (1) some racial or other class-based discriminatory animus underlying the Appellees' actions; and (2) that the conspiracy was aimed at interfering with Appellant's protected rights." (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993))).

With respect to his claims under Sections 1985 and 1986, Plaintiff alleges that Defendants

> held secret meetings of the minds, leading to issuing subpoenas, conducting interrogations, communication through e-mails, coming into contact, and further overt acts in the suppression of exculpatory evidence, unreasonably prolonging investigations, while doctoring records, video, audio recordings, falsifying reports and dissuading arresting officers from telling the truth, fraudulent concealment caused plaintiff to suffer possible discovery deception wrongly deceived.

(Am. Compl., Dkt. 24-1, at 11–12.)

These allegations plainly fail to state a claim under Section 1985(3). First, they are "nothing more than conclusory allegations of a conspiracy between and among Defendants." *see DuBois v. Bedford-Flatbush Chiropractic, P.C.*, 409 F. Supp. 3d 62, 67 (E.D.N.Y. 2019). Second, they do not suggest any agreement to violate constitutional rights based on class-based discriminatory animus. *see Brito*, 403 F. App'x at 621. Accordingly, Plaintiff's Section 1985 claim must be dismissed. *see Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (finding allegations of conspiracy "baseless" where the plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators"); *Webb v. Goord*, 340 F.3d 105, 110–11 (2d Cir. 2003) (to maintain a conspiracy action, the plaintiff "must provide some factual basis supporting a meeting of the

minds"); *Gyadu v. Hartford Ins. Co.*, 197 F.3d 590, 591 (2d Cir. 1999) (per curiam).

Since Plaintiff's Section 1985 conspiracy claim fails, his Section 1986 claim also fails. *see Graham v. Henderson,* 89 F.3d 75, 82 (2d Cir. 1996) ("[A] § 1986 claim is contingent on a valid § 1985 claim[.]"); *see also Wang v. Off. of Pro. Med. Conduct,* 228 F. App'x 17, 19 (2d Cir. 2007) (summary order). [15]

[15]   42 U.S.C. § 1986 creates civil liability for failing to prevent actions taken pursuant to a § 1985 conspiracy: "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented ...." 42 U.S.C. § 1986.

**\*13**  Therefore, Plaintiff's Section 1985 and 1986 claims are dismissed for failure to state a claim.

## III. ADA and Rehabilitation Act

Plaintiff alleges that the City failed "to implement adequate training courses to [BDS] in safeguarding [P]laintiff's [rights] pursuant to [the] ADA [and] Rehabilitation Act[.]" (Am. Compl., Dkt. 24-1, at 30.) He asserts that the City should have "implemented polic[ies, or customs fit in training Court appointed attorneys when faced with representing qualified individuals" (*id*), and that BDS attorney Regis's meeting with Plaintiff without "a qualified interpreter (advocate)" and "any auxiliary aids and devices for [P]laintiff's disability" violated Plaintiff's rights (*id.* at 31).

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance." 29 U.S.C. § 794(a); *see also Harris v. Mills,* 572 F.3d 66, 73 (2d Cir. 2009) (citing, *inter alia,* 29 U.S.C. § 794(a)). "In most cases, the standards are the same for actions under both statutes." *Harris,* 572 F.3d at 73 (internal quotations, alteration, and citation omitted). The Court thus analyzes Plaintiff's claims with reference only to Title II of the ADA, but the same analysis applies for any claim under the Rehabilitation Act.

To assert a claim under Title II, Plaintiff "must demonstrate that '(1) he is a qualified individual with a disability; (2) [Defendants] [are] subject to [the statute]; and (3) he was denied the opportunity to participate in or benefit from [ ] [D]efendant[s'] services, programs, or activities, or was otherwise discriminated against by [D]efendant[s] because of his disability." *Disabled in Action v. Bd. of Elections,* 752 F.3d 189, 196–97 (2d Cir. 2014) (footnote omitted) (quoting *McElwee v. County of Orange,* 700 F.3d 635, 640 (2d. Cir. 2012)). An ADA "plaintiff may base [his] discrimination claim on one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Davis v. Shah,* 821 F.3d 231, 260 (2d Cir. 2016); *see also Disabled in Action,* 752 F.3d 189, 197 (2d Cir. 2014) (ellipsis omitted) ("To assure meaningful access, 'reasonable accommodations in the [public entity]'s program may have to be made.' " (quoting *Henrietta D. v. Bloomberg,* 331 F.3d 261, 273 (2d Cir. 2003))).

Under the applicable standards, there are several limitations to Plaintiff's ADA claims. First, Title II claims may proceed against individuals only if they are government officers acting in their official capacity. *see Harris,* 572 F.3d at 72. Plaintiff thus cannot bring an ADA claim against BDS attorney Regis, a private individual (who does not qualify as a state actor, as previously discussed). Plaintiff's ADA claim against BDS attorney Regis is therefore dismissed. *see Green v. City of New York,* 465 F.3d 65, 76 (2d Cir. 2006) (affirming dismissal of ADA claim against a private individual).

**\*14**  Second, "Title II applies only to state and local governments, their instrumentalities, and commuter authorities." *Pierce v. Fordham Univ., Inc.,* 692 F. App'x 644, 646 (2d Cir. 2017) (summary order) (citing 42 U.S.C. §§ 12131, 12132; *Mary Jo C. v. N.Y. State & Local Ret. Sys.,* 707 F.3d 144, 162–63 (2d Cir. 2013)). The Second Circuit interprets " 'instrumentality' ... as referring to a creature of a state or municipality." *Green,* 465 F.3d at 79. A private entity "performing services pursuant to a contract with a municipality[,] even if it does so according

to the municipality's rules and under its direction, is not a creature of any governmental entity." *Id.* As discussed above in the dismissal of § 1983 claims against BDS, public defender organizations are private entities. Thus, Plaintiff's ADA claims against BDS are similarly dismissed. *see Browdy v. Karpe*, 131 F. App'x 751, 753–54 (2d Cir. 2005) (summary order) ("[Plaintiff's] ADA claims also were properly dismissed because he has sued his [public defenders], not [a] public entity[.]").

Third, "it is well[-]settled that monetary damages are [ ] available under Title II of the ADA [only] where the Plaintiff is able to demonstrate intentional discrimination." *Frank v. Sachem Sch. Dist.*, 84 F. Supp. 3d 172, 186 (E.D.N.Y. 2015) (citing *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009)), *aff'd*, 633 F. App'x 14 (2d Cir. 2016) (summary order). To prevail on a claim for intentional discrimination under Title II, "a plaintiff must prove a policymaker's 'deliberate indifference to the rights secured the disabled by those statutes,' in addition to the other elements of a Title II claim." *Gershanow v. City of Rockland*, No. 11-CV-8174 (CS), 2014 WL 1099821, at *4 (S.D.N.Y. Mar. 20, 2014) (quoting *KM ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 358 (S.D.N.Y. 2005)).

Unless Plaintiff properly pleads the City's intentional discrimination to his rights secured by the ADA and Rehabilitation Act, Plaintiff may claim only injunctive relief. Plaintiff's ADA and Rehabilitation Act claims against the City are thus dismissed, with leave to replead. If Plaintiff seeks to replead his claims under the ADA and Rehabilitation Act, he should make sure to identify the program, benefit, or activity that he was denied the ability to participate in due to his disability.

## IV. State-Law Claims

To the extent Plaintiff purports to bring state-law claims for intentional infliction of emotional distress ("IIED"), respondeat superior, or negligence (*see* Dkt. 26, at 4) these claims are dismissed with leave to replead.

### A. Intentional Infliction of Emotional Distress

"Under New York Law, [IIED] has four elements: '(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial possibility of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.' " *Saleh v. United States*, No. 12-CV-4598 (KBF), 2013 WL 5439140, at *11 (S.D.N.Y.

Sept. 27, 2013) (quoting *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993)). "Whether the alleged conduct is sufficiently extreme and outrageous is a matter of law for the courts to decide." *Frigerio v. United States*, No. 10-CV-9086 (SAS), 2011 WL 3163330, at *9 (S.D.N.Y. July 22, 2011). The extreme and outrageous requirement is met "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (internal quotations and citations omitted). "[T]he requirements of the rule are rigorous, and difficult to satisfy. Given the 'rigorous' requirements, courts often dismiss claims under the 'extreme and outrageous conduct' prong as a matter of law." *Reid v. Sack*, No. 20-CV-1817 (VM), 2021 WL 100490, at *5 (S.D.N.Y. Jan. 12, 2021) (quoting *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996)).

 **\*15** Plaintiff fails to allege that Defendants engaged in extreme and outrageous conduct with the intent to cause him emotional distress, or that he suffered emotional distress as a result of their conduct. To the extent Plaintiff's claim is that some Defendants engaged in extreme and outrageous conduct by "manufacturing" or "doctoring" evidence, that conclusory assertion, as previously discussed, is insufficient. Plaintiff's IIED claim therefore is dismissed.

### B. Respondeat Superior

Because Plaintiff has not demonstrated an "entitlement to recover against [any City] employee," his claim against the City under the doctrine of respondeat superior fails. *see Ferreira v. City of Binghamton*, 975 F.3d 255, 278 (2d Cir. 2020).

### C. Negligence

Plaintiff asserts that the City "was grossly negligent upon setting in place a contractual agreement between, (the City) and [BDS]." (Am. Compl., Dkt. 24-1, at 29.) Under New York law, an essential element of a negligence claim against a municipality is a "special duty to the injured person, in contrast to a general duty owed to the public." *Ferreira*, 975 F.3d at 283 (quoting *McLean v. City of New York*, 12 N.Y.3d 194, 199 (2009)), *certified question accepted*, 35 N.Y.3d 1105 (2020).

New York courts have recognized the existence of such a duty where either "(1) the plaintiff belonged to a class for whose benefit a statute was enacted; (2) the

government entity voluntarily assumed a duty to the plaintiff beyond what was owed to the public generally; or (3) the municipality took positive control of a known and dangerous safety condition."

*Id.* at 281 (quoting *Applewhite v. Accuhealth, Inc.*, 972 N.Y.S.2d 169, 173 (2013)). Plaintiff has alleged no such duty. His negligence claim against the City is therefore dismissed with leave to replead.

## V. Leave to Amend

In light of Plaintiff's *pro se* status, the Court grants Plaintiff leave to file a Second Amended Complaint within sixty (60) days of this Memorandum and Order. "Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over state-law claims when it has dismissed all claims over which it has original jurisdiction." *Liverpool*, 2019 WL 3745734, at *3 n.2 (internal quotations omitted). Because the Court grants Plaintiff leave to replead his federal claims, Plaintiff is also granted leave to replead his state-law claims.

Plaintiff's leave to amend his pleadings is subject to the following limits: (1) Plaintiff should not assert § 1983 claims against the CCRB, IAB, Corporation Counsel, and BDS because, as discussed above, they are non-suable entities under § 1983; (2) Plaintiff should not assert claims relating to the CCRB or IAB investigations against the arresting officers because, as discussed above, there is no constitutional right to a government investigation; (3) Plaintiff should not assert claims relating to the delayed disclosure of Officers Chow's and Battista's involvement in his arrest because, as discussed above, Plaintiff suffered no prejudice and was able to timely add them as defendants in *Walker v. Raja*; (4) Plaintiff should not re-assert any claim that surveillance videotape was "doctored," or that "manufactured" or "fabricated" evidence was produced or introduced during grand jury proceedings; and (5) Plaintiff should not assert-due process claims relating to his underlying arrest and indictment, as the Court has already determined in *Walker v. Raja* that "the evidence overwhelmingly supports a finding that Plaintiff robbed the store with a firearm," *Walker*, 2020 WL 606788, at *10. *see Hunt v. All. N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 728 (2d Cir. 1998) ("[I]t is proper to deny leave to replead where there is no merit in the proposed amendments or amendment would be futile.").

*16 Plaintiff is advised that the Second Amended Complaint will completely replace the Amended Complaint, must be

captioned "Second Amended Complaint," and shall bear the same docket number as this Memorandum and Order. Plaintiff is also advised that he should submit only one filing constituting his Second Amended Complaint, and that such filing need not include reproductions of court opinions to which Plaintiff cites. Plaintiff need not, and should not, file additional affirmations (*e.g.*, Dkts. 24-2, 26, 27) in connection with the Second Amended Complaint, and should submit only one copy of all further filings in this case. Furthermore, Plaintiff's Second Amended Complaint should reference only exhibits and documents filed in this action and bearing the same docket number as this Memorandum and Order.

Although the Court is obliged to allow Plaintiff to amend his complaint at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) (internal quotation marks omitted), Plaintiff should proceed in good faith and he must refrain from setting forth conclusory statements (*i.e.*, statements not based on specific factual allegations) in support of his claims and repeating any claims that have been dismissed by this Order.

## CONCLUSION

For the reasons stated above, the Amended Complaint is dismissed in its entirety for failure to state a claim pursuant to 28 U.S.C. §§ 1915A(b) and 1915(e)(2)(B). However, the Court grants Plaintiff's motion to proceed IFP and leave to file a Second Amended Complaint within sixty (60) days, as set forth above. All further proceedings shall be stayed for sixty (60) days or until Plaintiff files a Second Amended Complaint, whichever is earlier. If Plaintiff fails to file a Second Amended Complaint within the time allowed or fails to show good cause why he cannot, the Court shall direct the Clerk of Court to enter judgment and close this case.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore IFP status is denied for the purpose of an appeal. *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

## All Citations

Slip Copy, 2021 WL 1838277

**Walker v. City of New York, Slip Copy (2021)**

2021 WL 1838277

---

**End of Document**                                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

Allen v. Stringer, Not Reported in Fed. Rptr. (2021)

2021 WL 4472667

Case 1:22-cv-00984-MAD-TWD    Document 12    Filed 11/07/22    Page 35 of 42

2021 WL 4472667
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Doran ALLEN, Plaintiff-Appellant,

v.

Scott M. STRINGER, New York City Comptroller,
Warden AMKC-C-95, Defendants-Appellees.

20-3953
|
September 30, 2021

Appeal from a judgment of the United States District Court
for the Southern District of New York (Stanton, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Doran Allen, pro se,
Ossining NY.

FOR DEFENDANTS-APPELLEES: No appearance.

PRESENT: RICHARD C. WESLEY, RICHARD J.
SULLIVAN, Circuit Judges, JOHN G. KOELTL, District
Judge. [*]

[*]     Judge John G. Koeltl of the United States District
        Court for the Southern District of New York, sitting
        by designation.

**SUMMARY ORDER**

Appellant Doran Allen, proceeding pro se, sued Scott M.
Stringer, in his capacity as New York City Comptroller, and
the unnamed warden of the Rikers Island Anna M. Kross
Center ("AMKC") under 42 U.S.C. § 1983 for violations of
the Due Process Clause of the Fourteenth Amendment. Allen
alleges that, while he was detained at AMKC, a corrections
officer refused to help him carry breakfast trays, causing him
to slip and fall on broken stairs, injuring himself. The district
court dismissed the complaint sua sponte for failure to state a
claim. We assume the parties' familiarity with the underlying

facts, the procedural history of the case, and the issues on
appeal.

We review de novo a district court's sua sponte dismissal of
a complaint under 28 U.S.C. § 1915(e)(2). *Zaleski v. Burns,*
606 F.3d 51, 52 (2d Cir. 2010). Under that statute, the district
court must dismiss a complaint filed in forma pauperis if
it determines that the action "(i) is frivolous or malicious;
(ii) fails to state a claim on which relief may be granted;
or (iii) seeks monetary relief against a defendant who is
immune from such relief." 28 U.S.C. § 1915(e)(2)(B). To
avoid dismissal, a complaint must plead "enough facts to
state a claim to relief that is plausible on its face." *Bell Atl.
Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *see also Ashcroft
v. Iqbal,* 556 U.S. 662, 678 (2009) (recognizing that "legal
conclusions" and "[t]hreadbare recitals of the elements of a
cause of action, supported by mere conclusory statements, do
not suffice" to plead a viable claim). Pro se submissions are
reviewed with "special solicitude," and "must be construed
liberally and interpreted to raise the strongest arguments that
they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d
471, 474–75 (2d Cir. 2006) (internal quotation marks and
emphasis omitted).

Conditions-of-confinement claims brought by pretrial
detainees are analyzed under the Fourteenth Amendment's
Due Process clause. *Darnell v. Pineiro,* 849 F.3d 17, 29
(2d Cir. 2017). To state such a claim, a plaintiff must
satisfy both an objective prong and a subjective prong.
*See id.* The objective prong requires "showing that the
challenged conditions were sufficiently serious to constitute
objective deprivations of the right to due process," while
the subjective prong requires "showing that [an] officer
acted with at least deliberate indifference to the challenged
conditions." *Id.* (internal quotation marks omitted). If a
conditions-of-confinement claim is predicated on an unsafe
condition, a court will analyze "whether society considers
the risk that the prisoner complains of to be so grave that it
violates contemporary standards of decency to expose *anyone*
unwillingly to such a risk." *Helling v. McKinney,* 509 U.S. 25,
36 (1993).

Allen alleges that he slipped or tripped on broken stairs,
causing him to fall. But while the existence of broken stairs
could be deemed to constitute negligence on the part of
the prison, broken stairs alone cannot satisfy the objective
prong of a conditions-of-confinement claim. *See McCray v.
Lee,* 963 F.3d 110, 120 (2d Cir. 2020) (explaining that the
defendant's complaint alleging unconstitutional conditions of

Case 1:22-cv-00984-MAD-TWD   Document 12   Filed 11/07/22   Page 36 of 42

Allen v. Stringer, Not Reported in Fed. Rptr. (2021)

2021 WL 4472667

confinement after a slip and fall in an icy prison yard did not show "exceptional circumstances" that would "elevate" the conditions "beyond the typical level of danger presented by a slippery sidewalk or a wet floor"). Because broken stairs cannot be considered a risk that is "so grave that it violates contemporary standards of decency," Allen's conditions-of-confinement claim was properly dismissed. *Helling*, 509 U.S. at 36.

**\*2** But even if it could be argued that Allen alleged an objectively serious condition, the district court properly dismissed Allen's claims against Stringer and the AMKC warden due to the obvious deficiencies in Allen's complaint. As the district court concluded, the suit against the warden in his official capacity was more properly a suit against the City of New York because Allen did not allege that the warden personally had done or failed to do anything that violated his rights. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity... should be treated as suits against the State."). Similarly, Stringer, as the New York City Comptroller, is sued in his official capacity. Allen was therefore obligated to allege sufficient facts showing that the Fourteenth Amendment violation occurred "pursuant to a municipal policy or custom," *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (citing, inter alia, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692–94 (1978)), or was caused by a "failure to train," *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (citing *Monell*, 436 U.S. at 694). Allen did not allege any facts showing that the corrections officer acted pursuant to an unconstitutional policy or custom, or that the City of New York failed to train its corrections officers, as required for such a claim.

The district court also did not abuse its discretion by declining to exercise supplemental jurisdiction over any state-law claims because the district court properly dismissed Allen's § 1983 claim, the only claim over which it had original jurisdiction. *See Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("[A] district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction." (internal quotation marks omitted)).

Finally, the district court did not err by denying Allen leave to amend his complaint. A district court should not dismiss a pro se plaintiff's complaint without granting leave to amend "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (internal quotation marks omitted). As discussed above, the incident involving the corrections officer and the broken steps did not amount to a due process violation, and that deficiency in the complaint cannot not be cured. Accordingly, amendment would have been futile.

We have considered all of Allen's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

### All Citations

Not Reported in Fed. Rptr., 2021 WL 4472667

---

2005 WL 1876064

2005 WL 1876064
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Dumka VIATOR, Plaintiff,
v.
CITY OF ROCHESTER, Rochester Police Department,
Police Officer Mitchell (True First Name Unknown),
Individually and in his Official Capacity, State
of New York, New York State Police, County of
Monroe, Monroe County Sheriff's Office, Police
Officers "John Doe 1-10", (Last Ten Names Being
Fictitious, True Names Unknown, Said Persons
Being Police Officers, Employees and/or Agents of
Defendants, Who Stopped, Detained, Questioned and
Searched Plaintiff's Person and Vehicle), Defendants.

No. 02-CV-6453.
|
Aug. 8, 2005.

**Attorneys and Law Firms**

Michael Cobbs, Stephen J. Clar, Brown & Hutchinson,
Rochester, NY, for Plaintiff.

John M. Campolieto, City of Rochester Law Department,
Charles D. Steinman, New York State Attorney General's
Office Department of Law, Howard A. Stark, Monroe County
Department of Law, Rochester, NY, for Defendants.

DECISION & ORDER

INTRODUCTION

TELESCA, J.

**\*1** Plaintiff Dumka Viator ("plaintiff") brings this action
against the City of Rochester (the "City") and Rochester
Police Officer John Mitchell ("Officer Mitchell") pursuant
to 42 U.S.C. § 1983, alleging that he was racially profiled
and that his constitutional rights were violated when Officer
Mitchell and other officers from the Rochester Police
Department detained him, interrogated him and searched
his automobile during the course of a traffic stop.[1] The
City contends that the police officers were members of an

interdiction team dedicated to stopping the flow of illegal
narcotics into Monroe County, and that they had probable
cause to stop and search plaintiff's automobile. Officer
Mitchell also claims that he is entitled to qualified immunity
under 42 U.S.C. § 1983, since the alleged violation occurred
in the course of his official duties.

[1]    By Decision and Order dated December 17, 2002,
plaintiff's claims against New York State and the
New York State Police Department were dismissed
with prejudice. (Doc. No. 13). By Stipulation
and Order filed November 8, 2004, plaintiff's
claims against defendants Monroe County and
Monroe County Sheriff's Office were dismissed
with prejudice. (Doc. No 31). By Order filed July
14, 2005, plaintiff's claims against the remaining
State defendants were dismissed with prejudice.
(Doc. No. 36).

A bench trial was held before the Court on August 2 and
3, 2005. Five witnesses testified at trial, including: plaintiff
Dumka Viator; Rochester Police Officer John Mitchell:
plaintiff's wife Sharon Viator; Rochester Police Officer Eden
Torres; and Rochester Police canine Officer Tim Waterman.
The following constitutes my findings of fact and conclusions
of law in accordance with Rule 52(a) of the Federal Rules of
Civil Procedure.

FINDINGS OF FACT

Plaintiff was born in Nigeria and immigrated to the United
States approximately seventeen years ago. For at least the last
four years, he has resided in the town of Irondequoit, a suburb
of Rochester, New York, with his wife and five children. He
is presently employed as a senior sales representative and
finance advisor at Webster Chrysler Jeep, but previously was
employed as an automobile salesman at Irondequoit Dodge
when the events that gave rise to this controversy occurred.
One of the perks of his employment at Irondequoit Dodge
was that he was able to select any of the demo vehicles at the
dealership for his personal use.

Plaintiff testified that on Wednesday August 29, 2001, he
drove from Rochester to New York City in a gold-colored
2001 Jeep Grand Cherokee which was registered to the
dealership. His father had recently passed away and he needed
to renew his passport at the Nigerian embassy so that he could
attend his father's burial in Nigeria. While in New York City,

he also planned to watch a tennis match at the U.S. Open. He accomplished both goals and drove back to Rochester the following day, August 30, 2001. He traveled the New York State Thruway directly from New York City, and stopped only to refill his gas tank and purchase coffee. At approximately 6:00 p.m., he exited the Thruway at Exit 45, where he stopped to pay a toll of $9.95 and continued westbound on Route 490 West towards Rochester.

At that time, Rochester Police Officer Christopher Tuttle was positioned near the Exit 45 toll booths as a member of a drug interdiction detail comprised of New York State Troopers, Monroe County Sheriff's deputies, and Rochester Police Department officers named the "Metro Rochester Narcotics Unit" ("MRNU"). MRNU's mission was to interdict and prevent the flow of illegal narcotics into Monroe County. Knowing that much of Rochester's illicit drug supply comes from New York City, Officer Tuttle's role was to observe any vehicles that paid a $9.95 toll, which is the toll for a vehicle making a direct trip from New York City. He would then inform plainclothes officers who were stationed nearby of the make, model and license plate of such a vehicle, who in turn would conduct a moving surveillance of that vehicle. The plainclothes officers, who were driving unmarked cars would coordinate their surveillance with uniformed officers driving marked cars and follow the "vehicle of interest." If the driver committed a traffic violation, it would then be stopped and issued a ticket. Such a stop would give the uniformed officer the opportunity to question the driver and determine whether there existed probable cause to search the vehicle for illicit narcotics. If the driver of a vehicle of interest did not commit a traffic violation, he would not be stopped.

**\*2** On August 30, 2001, Officer Tuttle observed that plaintiff paid a $9.95 toll, and radioed Officer Torres and a Monroe County Sheriff's Deputy that a gold-colored Jeep Grand Cherokee had just returned from New York City exiting on Interstate Route 90 at Exit 45. The officers then followed plaintiff as he continued on Route 490 West for approximately six miles before they radioed to Officer Mitchell, who was positioned nearby and directed that he should take over monitoring the vehicle. Officer Mitchell, in his marked police car, entered Route 490 West at the Penfield Road exit and followed plaintiff for approximately one to two miles before he directed him to pull over for failing to signal when making a lane change.

*A. The Traffic Stop*

Plaintiff testified that once through the toll booth, he traveled in the far right lane of Route 490 West until he reached the Penfield Road exit. He then moved into the far left lane, or the "fast lane," to allow cars to merge onto Route 490 West from the right. He first noticed a Rochester Police vehicle when he was passing the location where Route 590 North merged into Route 490 West. According to plaintiff, the officer pulled into the fast lane just behind him and almost immediately activated the vehicle's emergency lights, signaling that plaintiff should pull over to the side of the road. Plaintiff decelerated and used his turn signal to indicate that he was changing lanes, and stopped his vehicle on the right shoulder of Route 490 near the Winton Road exit. He alleges that he never changed lanes without first signaling.

Officer Mitchell testified that he was assisting MRNU on the night of August 30, 2001, when he received a radio call from Officer Torres alerting him to an approaching vehicle of interest. According to Officer Mitchell, he entered Route 490 at the Penfield Road exit-several miles before the Route 590 off ramp. He noticed plaintiff in the fast (far left) lane, and followed him for several miles before he observed plaintiff moving from the fast lane to the middle lane without signaling the lane change. Officer Mitchell, realizing that a failure to signal a lane change is a violation of the New York State Vehicle and Traffic Law, then turned on his emergency lights to signal plaintiff to pull over. Plaintiff complied and stopped his vehicle on the right shoulder of Route 490 near the Winton Road exit.

Officer Torres also testified that he initiated the moving surveillance of plaintiff's automobile once plaintiff paid the $9.95 toll at Exit 45 of the New York State Thruway. He then followed plaintiff in his unmarked car along Route 490 West and advised Officer Mitchell to take over the surveillance near Penfield Road. He observed Officer Mitchell enter Route 490 at the Penfield Road Exit and follow plaintiff. Officer Torres then dropped back and did not see the illegal lane change because vehicles ahead of him were in his line of sight.

Based on these facts adduced at trial, I find that Officer Mitchell observed plaintiff changing lanes without signaling. Both Officer Mitchell and Officer Torres testified that Officer Mitchell was positioned on Linden Avenue when he received the call to follow plaintiff's vehicle and entered Route 490 West from the Penfield Road entrance. I find the officers' versions of events to be more credible than plaintiff's. Moreover, I find that plaintiff's credibility is compromised since he admitted on re-direct examination that he had lied

2005 WL 1876064

while under oath on at least three prior occasions concerning the identity of his female passenger on August 30, 2001. Accordingly, I find that the evidence clearly establishes that plaintiff changed lanes without signaling.

### B. The Search of Plaintiff's Vehicle

#### 1. Plaintiff Consented to the Search of His Vehicle

**\*3** Once plaintiff stopped his automobile on the right shoulder of Route 490 West near the Winton Road exit, Officer Mitchell parked his patrol car a short distance behind him. Officer Mitchell then approached the car and spoke with plaintiff.

Plaintiff testified that Officer Mitchell first informed him that he was being stopped for speeding. Plaintiff replied that he had his cruise control set within the legal speed limit. Officer Mitchell then asked where plaintiff was coming from, to which plaintiff responded "New York City." According to plaintiff, Officer Mitchell then returned to his patrol car. Approximately five minutes later Officer Mitchell returned to plaintiff's vehicle and again asked where he was coming from. Plaintiff asked if there was a problem and Officer Mitchell informed him that he had been stopped for changing lanes without signaling. Plaintiff then inquired of Officer Mitchell about the discrepancies in the reasons offered to him for stopping his vehicle. Officer Mitchell replied by engaging in a line of questioning (to which plaintiff took offense), including whether plaintiff knew anything about narcotics and why he was driving a car that was not registered to him. Officer Mitchell then asked plaintiff for consent to search his vehicle. Plaintiff asked if he needed a warrant first, to which Officer Mitchell replied that a police dog would not need a warrant. At that point, plaintiff alleges that Officer Mitchell lunged toward the driver's door, grabbed the handle, and "yanked" it open. Plaintiff testified that Officer Mitchell's aggressive actions frightened him and he exited the vehicle. He then consented to Officer Mitchell's request to search his vehicle on the condition that he could watch, "to make sure that [they] didn't put anything in my car." He further testified that Officer Mitchell never asked him for his driver's license or vehicle registration card, and that he did not receive a traffic ticket until he later prompted Officer Mitchell for some documentation of the stop. He admitted that he did not try to stop the search at any point, and that he was never handcuffed, personally searched, or placed in police custody.

Officer Mitchell testified that upon approaching plaintiff's vehicle on August 30, 2001, he tried to engage plaintiff in

small talk to put him more at ease and immediately asked for plaintiff's driver's license and vehicle registration card. He also testified that as he approached plaintiff's vehicle he noticed in plain view that plaintiff had only a gym bag and lap top computer in the rear of the vehicle, which he thought suspicious since plaintiff had informed him that he and his passenger had been in New York City for "several days." He returned to his patrol car where he ran plaintiff's license plate and learned that the car was not registered in plaintiff's name, but in the name of an automobile dealership. While in his patrol car, he also radioed Officer Torres, who was nearby, and informed him of his suspicions and that he planned to ask for consent to search the vehicle. Officer Mitchell also contacted Officer Waterman to request that he travel to the scene with police dog "Griz" to conduct an exterior search of plaintiff's vehicle.

**\*4** Officer Mitchell testified that when he returned to plaintiff's vehicle he asked for plaintiff's consent to search the vehicle. According to Officer Mitchell, plaintiff acquiesced on the condition that he could watch the search. He did not recall plaintiff inquiring about a search warrant, nor did he observe another officer nearby when plaintiff gave consent to search.

Officer Torres arrived on the scene just after Officer Mitchell returned to plaintiff's vehicle. He parked behind Officer's Mitchell's patrol car and walked toward plaintiff's vehicle. He testified that although he did not hear Officer Mitchell ask plaintiff's consent to search the vehicle he did hear plaintiff agree to the search provided he could watch.

Based on these facts, I find that plaintiff gave Officer Mitchell his consent to search his vehicle. Both Officer Mitchell and Officer Torres testified that plaintiff agreed to the search on the condition that he could watch. In addition, I find inconsistencies in plaintiff's version of events that lead me to doubt his credibility. For instance, had Officer Mitchell never asked for plaintiff's driver's license, as plaintiff testified, he could not have issued the traffic ticket because information from the driver's license was needed to complete the traffic summons. Moreover, plaintiff gave three different versions of the identity of his female passenger, but explained that he did so to protect his "family interests." Accordingly, I find that the evidence clearly establishes that plaintiff consented to the search of his vehicle on the condition that he could observe the search.

#### 2. The Canine Searches

2005 WL 1876064

Plaintiff testified that before the manual search of his vehicle began, a canine search was conducted. He claimed that the police dog, a large German Shepard, was removed from the rear seat of a patrol car and led directly to the driver's seat of his vehicle. Plaintiff recalled that the police dog had sniffed everything in the car, including the inside of his tennis and laptop bags. He further testified that after the search of the interior of his vehicle, the canine was led directly back to the patrol car. Plaintiff did not see the police dog search the perimeter of the exterior of the vehicle, nor did he see the dog "alert" or "hit" during the search.

According to Officer Mitchell's testimony, the police dog arrived just after plaintiff consented to the search of his vehicle. Upon arriving at the scene, Officer Waterman leashed Griz before removing him from the patrol car and led the dog to plaintiff's vehicle. Griz first circled the perimeter of the vehicle to search the exterior. At the vehicle's driver's side rear bumper, Griz started to bark, scratch and swat, indicating that he had detected the scent of narcotics. After completing the exterior search, Officer Waterman placed Griz in plaintiff's car where he conducted an interior search, and again indicated that he found the scent of narcotics in the back of the vehicle. Officer Waterman then returned Griz to his patrol car and left the scene.

 *5  Plaintiff's attorney called Officer Waterman, the canine handler, to testify at trial but did not address whether he conducted a search of the exterior of the vehicle with Griz or whether Griz indicated that he had detected the scent of narcotics. Instead, his inquiry of Officer Waterman was limited to the nature of the charge and content of the traffic summons issued to the plaintiff by Officer Mitchell.

I find that the evidence established at trial clearly demonstrates that a canine search of the exterior of plaintiff's vehicle was conducted, and that the police dog indicated that he detected the scent of an illicit substance.

 *3. The Manual Search*
Plaintiff, Officer Mitchell and Officer Torres each testified that the manual search conducted subsequent to the canine searches revealed no illicit substances.

*CONCLUSIONS OF LAW*

Plaintiff alleges that he was discriminated against on the basis of his race in violation of 42 U.S.C. § 1983. Section 1983 allows an individual to sue for deprivation of any federally protected right by a person acting "under the color of any statute, ordinance, regulation, custom or usage of any State or Territory of the District of Columbia...." 42 U.S.C. § 1983. Specifically, plaintiff claims that on August 30, 2001, he was the subject of racial profiling and the unreasonable stop and search of his vehicle by Officer Mitchell and other officers from the Rochester Police Department in violation of his constitutionally protected right to be free from an unreasonable search under the Fourth Amendment.

Plaintiff bears the burden of proving by a preponderance of the evidence that he was deprived of a right secured by the Constitution or by the laws of the United States and that the person or persons depriving the party of the right acted under color of state law. *Ruggiero v. Krzeminski,* 928 F.2d 558, 562-63 (2d Cir.1991).

For the reasons set forth below, I find that plaintiff has failed to establish by a preponderance of the evidence that any of his constitutionally protected rights were violated as alleged under 42 U.S.C. § 1983, and his complaint, therefore, is dismissed.

*A. Officer Mitchell Had Probable Cause to Stop Plaintiff*
Plaintiff first argues that Officer Mitchell did not have probable cause to stop his vehicle on the evening of August 30, 2001, that he was stopped principally because he is black, and that the traffic violation was a pretext to investigate possible drug trafficking.

It is well-established that an automobile stop is reasonable under the Fourth Amendment if an officer has probable cause to believe that a traffic violation has occurred, even if the traffic violation is only a pretextual reason for the stop. *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). "[A]n observed traffic violation legitimates a stop even if the detectives do not rely on the traffic violation." *United States v. Dhinsa,* 171 F.3d 721, 725 (2d Cir.2001).

 *6  As explained above, Officer Mitchell witnessed plaintiff move from the fast lane to the middle lane without signaling the change, and cited plaintiff with a violation of New York State Vehicle and Traffic Law § 1163(a), which provides that "[n]o person shall ... move right or left on a roadway unless such movement can be made with reasonable safety." N.Y.

Case 1:22-cv-00984-MAD-TWD    Document 12    Filed 11/07/22    Page 41 of 42
Viator v. City of Rochester, Not Reported in F.Supp.2d (2005)
2005 WL 1876064

VEHICLE AND TRAFFIC LAW § 1163(a) (McKinney's 1959).

Plaintiff argues that § 1163(a) requires a motorist only to make a safe lane change, and that since plaintiff made a safe lane change there was no traffic violation. However, this argument ignores an entire sentence of § 1163(a) which provides that "[n]o person shall so turn in any vehicle *without giving an appropriate signal* in the manner herein after provided." N.Y. VEHICLE AND TRAFFIC LAW § 1163(a) (McKinney's 1959). (Emphasis added.) That sentence explicitly incorporates § 1163(d) which prohibits drivers from changing lanes without first signaling the change. *See* N.Y. VEHICLE AND TRAFFIC LAW § 1163(d) (McKinney's 1959). As such, I find that plaintiff's failure to signal his lane change constitutes probable cause for the August 30, 2001 traffic stop by Officer Mitchell. [2] *See United States v. Scopo,* 19 F.3d 777, 781 (2d Cir.1994) (Probable cause to stop defendant where he failed to signal a lane change.).

[2]    It is irrelevant that the traffic ticket in question was later dismissed because Officer Mitchell testified that he did not appear to support the ticket because he was never informed of the hearing date.

While plaintiff alleges that he was the victim of racial profiling because his vehicle was targeted by MRNU simply because he is black, the only tangible proof presented by plaintiff of racial profiling is his skin color. No reasonable inference can be made from that fact alone that the sole reason for the traffic stop was the color of his skin. Plaintiff also failed to prove that the City maintains a policy of racial profiling as part of the MRNU drug interdiction program. However, the City did prove by a preponderance of the evidence that there was a reasonable basis to consider plaintiff's automobile to be a "vehicle of interest," given that it was traveling from New York City, and was registered to an automobile dealership-two possible signs of drug trafficking which was supported by the testimony of two experienced police officers-Mitchell and Torres.

*B. Officer Mitchell Had Probable Cause to Search Plaintiff's Automobile*

Plaintiff next contends that the search of his vehicle violated his Fourth Amendment rights because the officers had neither consent nor probable cause to conduct the search. Based on the facts adduced at trial, I find that the search of plaintiff's vehicle was both reasonable and valid since plaintiff consented to the search. I also find that plaintiff's consent

was not necessary to conduct the search since the alert by the police dog alone provided sufficient probable cause to conduct the search.

Although plaintiff alleges that he never consented to the search of his vehicle, the evidence proves otherwise. Both Officer Mitchell and Officer Torres heard plaintiff acquiesce to the search on the condition that he could watch. He also admitted that he never asked the officers to stop searching once they started.

**\*7** Moreover, to the extent that plaintiff alleges that he only consented because he was frightened by the officers, there is no proof in support of that claim. Plaintiff testified that Officer Mitchell "yanked" the door of plaintiff's vehicle open, thus giving plaintiff no choice but to consent to the search of his vehicle. Also, plaintiff claims that he was intimidated into acquiescing to the search because he was surrounded by several armed police officers. In contrast, Officer Mitchell testified that he did not see any other officers in the area when plaintiff consented; Officer Torres testified that he was merely approaching plaintiff as he consented; and Officer Waterman testified that he did not arrive until after plaintiff had consented.

I find that there was sufficient probable cause for the search independent of plaintiff's consent. Under the automobile exception, a "warrantless search of a movable vehicle is permissible when the police have probable cause to believe that the vehicle contains contraband." *United States v. Harwood,* 998 F.2d 91, 96 (2d Cir.1993). "Probable cause exists where the facts and circumstances within ... [the officer's] knowledge and of which they had reasonable trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that evidence of a crime will be found in the place to be searched." *United States v. Gaskin,* 364 F.3d 438, 456 (2d Cir.2004) (quoting *Brinegar v. United States,* 338 U.S. 160, 175-76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)) (internal quotation mark omitted). Further, an officer's experience and training may allow him to form probable cause where a layman might not. *Id.* at 457.

Before the interior of plaintiff's vehicle was searched, Officer Mitchell knew that: (1) the police dog had indicated that he detected the scent of contraband, specifically a narcotic; (2) plaintiff made a direct trip from New York City to Rochester Exit 45 prior to the stop; (3) plaintiff was driving a vehicle that was not registered to him; and (4) there appeared to be

Case 1:22-cv-00984-MAD-TWD   Document 12   Filed 11/07/22   Page 42 of 42
Viator v. City of Rochester, Not Reported in F.Supp.2d (2005)
2005 WL 1876064

little luggage for what plaintiff told Officer Mitchell was a trip to New York City of several days duration for two people.

The fact that the K-9 dog Griz indicated that he detected the scent of narcotics by itself is sufficient probable cause to search plaintiff's vehicle. In *Illinois v. Caballes,* the Supreme Court held that a canine search of a vehicle during a lawful traffic stop "does not implicate legitimate privacy interests." *United States v. Caballes,* --- U.S. ----, ----, 125 S.Ct. 834, 838, 160 L.Ed.2d 842 (2005). Moreover, an alert by a police dog in the course of a traffic stop is sufficiently reliable to establish probable cause for a full search of the vehicle. *United States v. Waltzer,* 685 F.2d 370, 370 (2d Cir.1982). *United States v. Fronk,* 173 F.R.D. 59, 73 (W.D.N.Y.1997). As such, I find that there existed probable cause to search the entirety of plaintiff's vehicle.

*CONCLUSION*

For the reasons set forth above, I find that plaintiff has failed to carry his burden of proving by a preponderance of the evidence that his constitutional rights were violated in the course of the August 30, 2001 traffic stop and subsequent search. Failure to signal prior to changing lanes is a moving violation of the New York State Vehicle and Traffic Law and provides probable cause for police to conduct a traffic stop. Furthermore, the evidence demonstrates that plaintiff gave Officer Mitchell permission to search his vehicle-conditioned on the fact that he observe the search as it was conducted. The proof clearly establishes that the plaintiff and his passenger (who did not testify) were present during the search.

**\*8** In addition, since plaintiff's constitutional rights were not violated in the course of the August 30, 2001 traffic stop and search, there is no need to determine whether Officer Mitchell is entitled to qualified immunity under § 1983. *See* 42 U.S.C. § 1983; *Warren v. Dwyer,* 906 F.2d 70, 74 (2d Cir.1990). Accordingly, I grant judgment in favor of defendants City of Rochester and Officer Mitchell, and the Clerk of the Court is hereby directed to enter judgment in favor of defendants Officer John Mitchell and the City of Rochester, dismissing plaintiff's claims in all respects.

ALL OF THE ABOVE IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1876064